**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:22-cv-02093-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| PORTER-GAUD SCHOOL | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The following matter is before the court on multiple pending motions. Defendant Porter-Gaud School ("Porter-Gaud") brings a motion to amend its answer to the amended complaint, ECF No. 61; a sealed motion for protective order, ECF No. 63; and a motion to dismiss the second amended complaint, ECF No. 70. Plaintiff John Doe ("John Doe") brings a motion to compel Porter-Gaud to fully respond to his various discovery requests, ECF No. 74; a motion to exceed, ECF No. 75; and a motion to compel Snapchat, Inc. ("Snapchat"), a nonparty to this case, to respond to his subpoenas, ECF No. 85.

For the reasons set forth below, the court finds as moot Porter-Gaud's motion to amend, ECF No. 61. The court defers ruling on Porter-Gaud's motion for protective order, ECF No. 63, and orders that the parties confer on details regarding the appointment of a special master for resolution of that motion. The court grants in part and denies in part Porter-Gaud's motion to dismiss, ECF No. 70. The court grants in part and defers ruling on in part John Doe's motion to compel Porter-Gaud, ECF No. 74. The court denies without prejudice in part and defers ruling on in part John Doe's motion to exceed, ECF No. 75. Finally, the court denies without prejudice John Doe's motion to compel Snapchat, ECF No. 85.

1

## I.  BACKGROUND

This complaint arises from Porter-Gaud's investigation into a student's claims that she was raped by another student.  Porter-Gaud is "an independent coeducational college preparatory day school" in Charleston, South Carolina.  ECF No. 62, 2d Amend. Compl. ¶ 2.  In December 2018, the then fifteen-year-old John Doe engaged in an allegedly consensual sexual encounter with his classmate and neighbor, Catherine Roe ("Roe").  Id. ¶ 9.  The two engaged in multiple sexual encounters with each other on separate occasions.  Id. ¶¶ 12–13.  Five months after the initial encounter, Catherine Roe told her parents that the initial encounter was non-consensual rape, though the remainder of the sexual interactions were mutually consensual.  Id. ¶¶ 14.  John Doe denies the claims of coercion on any occasion.  Id. ¶ 15.  Initially, both sets of parents decided that the matter was settled and that the teens should just stay apart.  Id. ¶ 16.

Catherine Roe, however, was allegedly not satisfied by that arrangement and instead told the Porter-Gaud school administrators and counselors that John Doe had raped her.  Id.  Porter-Gaud called the police to investigate the allegations of rape.  Id. ¶ 17.  The police did not arrest John Doe because "there was no evidence of [John] Doe's wrongdoing" and "[e]ven if Ms. Roe had told the police her side of the story, . . . it still would have been a: 'he said/she said' case with corroborating witnesses supporting Mr. Doe, not Miss Roe's account of the evening."  Id.  The police ended their investigation with no action taken against John Doe.  Id. ¶ 18.  Catherine Roe was dissatisfied with this outcome and purportedly "harassed, slandered, slapped and pushed [John] Doe publicly at school (twice)" as a result.  Id. ¶ 22.  Porter-Gaud thereafter brought in T&M Protection Resources, LLC ("T&M"), "investigators from New York with the #MeTOO

2

Movement." Id. ¶¶ 20–21.  Eventually, the investigators dropped their inquiry, and Porter-Gaud notified John Doe that there was no policy violation on his part and that he was free to return as a student in good standing.  Id. ¶¶ 24–27.  Yet John Doe asserts that school officials refused to notify the other witnesses and students that they found he had engaged in no wrongdoing.  Id. ¶ 27.

Mary Doe filed a complaint on behalf of her son, John Doe, in the Charleston County Court of Common Pleas on May 29, 2022.  ECF No. 1-1, Doe v. Porter Gaud Sch., No. 2022-CP-10-02441 (Charleston Cnty. Ct. C.P. May 29, 2022), Compl.  At the time of the complaint's filing, John Doe was an adult who had turned eighteen on July 31, 2021.  Compl. ¶ 2.  Porter-Gaud removed the complaint to federal district court on July 1, 2022, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446.  ECF No. 1.  Mary Doe filed an amended complaint on July 21, 2022, which named John Doe as a co-plaintiff (together, the "Does").  ECF No. 8, Amend. Compl.  The court dismissed Mary Doe as a plaintiff on January 6, 2023.  ECF No. 28.  On February 3, 2023, John Doe filed a motion to reconsider the court's order dismissing Mary Doe, which the court denied on April 3, 2023.  ECF No. 36.  On June 24, 2023, John Doe filed a motion to amend his complaint, ECF No. 51, and, on October 17, 2023, the court granted this motion as to John Doe's sought amendments but denied it to the extent it sought to revive Mary Doe's claims, ECF No. 60.

On November 3, 2023, Porter-Gaud filed a motion to amend/correct its answer to the first amended complaint.  ECF No. 61.  On November 16, 2023, John Doe responded in opposition.  ECF No. 64.  However, prior to filing his response, John Doe filed the second amended complaint, now the operative complaint, on November 6, 2023.  ECF

No. 62, 2d Amend. Compl.  Porter-Gaud answered the second amended complaint on December 5, 2023.  ECF No. 69.

There are several ongoing discovery disputes currently before the court.  On November 9, 2023, Porter-Gaud filed a sealed motion for protective order in response to John Doe's subpoena duces tecum that he served on T&M.  ECF No. 63.  On December 18, 2023, John Doe filed a sealed response in opposition.  ECF No. 76.  On December 18, 2023, John Doe filed a motion to compel Porter-Gaud, ECF No. 74, and a motion to exceed, ECF No. 75.  On January 10, 2024, Porter-Gaud filed a sealed response in opposition to John Doe's request to exceed, ECF No. 87, and filed a sealed response in opposition to John Doe's motion to compel, ECF No. 88.  On January 4, 2024, John Doe filed a sealed motion to compel Snapchat.  ECF No. 85.  Porter-Gaud has not filed or otherwise responded to this motion to date.

Finally, on December 5, 2023, Porter-Gaud filed a partial motion to dismiss the second amended complaint.  ECF No. 70.  John Doe filed a sealed response in opposition on December 29, 2023, ECF No. 83, to which Porter-Gaud replied on January 12, 2024, ECF No. 89.  The court held a hearing on these motions on June 17, 2024.  ECF No. 100.  On June 18, 2024, John Doe supplemented his response in opposition with a previously omitted document in support, per his counsel's representations at the hearing.  ECF No. 99.  As such, the motions are fully briefed and are now ripe for review.

## II.  DISCUSSION

To begin, the court notes that Porter-Gaud filed its motion to amend its answer to John Doe's first amended complaint before John Doe filed a second amended complaint and Porter-Gaud filed its answer to that second amended complaint.  See ECF Nos. 61;

4

62; 69. Consequently, the court finds that Porter-Gaud's motion to amend its answer to John Doe's first amended complaint is moot. As such, the remaining issues before the court are the various discovery disputes and Porter-Gaud's motion to dismiss. The court will address the discovery disputes first and then turn to the motion to dismiss.

### A. Discovery Disputes

There are four ongoing discovery disputes, and the court will take each of these in the order in which they were filed. First, Porter-Gaud filed a motion for protective order with respect to a subpoena John Doe served on T&M. ECF No. 63. Second, John Doe filed a motion to compel Porter-Gaud to respond to both his interrogatories and requests for production ("RFPs"). ECF No. 74. Third, John Doe filed a motion to exceed the number of interrogatories, RFPs, and depositions allowed by the Federal Rules of Civil Procedure. ECF No. 75. Fourth and finally, John Doe filed a motion to compel Snapchat to respond to his subpoenas. ECF No. 85.

### 1. Porter Gaud's Motion for Protective Order

Porter-Gaud requests an order of protection relieving T&M from its production obligation because the sought documents are privileged under the work product doctrine and the attorney-client privilege. ECF No. 63 at 1. Porter-Gaud notes that John Doe has requested the same documents from Porter-Gaud itself via interrogatories and RFPs and, in response, Porter-Gaud produced a privilege log citing these same privileges. Id. at 1 n.1.

In response, John Doe disagrees and identifies three issues for the court. ECF No. 76 at 2. First, he argues that it is debatable whether there was an attorney-client relationship between T&M and Porter-Gaud and, even if there were, it is likely that a

waiver has occurred.  Id. at 2–6.  Second, John Doe argues that the work-product doctrine might not apply because the investigation was driven by policy compliance rather than the threat of litigation.  Id. at 6–14.  Third, John Doe emphatically argues that the documentation merits disclosure so that he can prosecute his breach of contract claims. Id. at 15–17.

Prior to the June 17, 2024 hearing on the various pending motions, the court notified the parties via email that it likely required in camera review of the disputed documents and explained that it was contemplating the appointment of a special master to resolve Porter-Gaud's motion for protective order.  Pursuant to Rule 53(a)(1)(C), a district court may appoint a special master to address pretrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district. Fed. R. Civ. P. 53(a)(1)(C).  Further, beyond the provisions of Rule 53, district courts have the inherent power to appoint a special master for the administration of justice "when deemed by it essential."  Trull v. Dayco Prods., LLC, 178 F. App'x 247, 251 (4th Cir. 2006) (citing United States v. Connecticut, 931 F. Supp. 974, 984 (D. Conn. 1996)).  The court must give notice to the parties and an opportunity to be heard on the questions of whether a special master should be appointed and the terms of such appointment.  Fed. R. Civ. P. 53(b)(1).  Thus, during the hearing, the court reiterated that it was likely going to appoint a special master and heard from the parties on this issue. ECF No. 100.

In response, Porter-Gaud offered to revise and organize its privilege log and to produce the disputed documents for in camera review.  Id.  Since then, Porter-Gaud sent over the documents for the court's review.  The documents Porter-Gaud sent for in

camera review consisted of an updated privilege log, the 202-page T&M report, and 925 pages of Porter-Gaud's counsel's communications. Close review of these documents is necessary for the court to determine whether the documents are protected by either attorney-client privilege, and/or the work product doctrine, and whether Porter-Gaud or its agents waived said privilege.

The court finds that a special master remains necessary to comb through Porter-Gaud's large production and to assist it in resolving Porter-Gaud's motion for protective order. The court therefore orders the parties to confer on the contents of the special master appointment order. The parties shall submit a joint report to chambers via email no later than fourteen (14) days after the filing of this order. In this joint report, the parties shall propose the name of an individual who has the qualifications and the availability to serve as the special master for the court to consider. If the parties cannot agree on one individual, they may propose two individuals for the court to consider in making this appointment.[1] The parties shall also propose an hourly rate for the special master's compensation. Thereafter, the court may select one of the two proposed special

---

[1] A draft appointment order is attached to this order as Exhibit A. The name of the individual and certain aspects of the special master's compensation are currently left blank. The parties may notice that the draft order currently proposes that the parties split the cost of the special master proportionally based on the percentage of the motion for protective order that each party wins. The court has broad discretion when deciding how to allocate the special master's fees. Covington v. North Carolina, 2018 WL 8060397, at *1 (M.D.N.C. Mar. 22, 2018). "The court must allocate payment [for the special master] among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master. An interim allocation may be amended to reflect a decision on the merits." Fed. R. Civ. P. 53(g)(3); accord Gary W. v. Louisiana, 601 F.2d 240, 246 (5th Cir. 1979) ("[A] district court does not abuse its discretion by taxing the losing party with the full share of the Special Master's fee."). Of course, if the parties mutually agree to split the cost of the special master equally, the court would be amenable to that suggestion.

masters or make its own selection.  Likewise, court may approve of the proposed special

master's hourly compensation rate or may set a different rate.

### 2.  John Doe's Motion to Compel Porter-Gaud

Federal Rule of Civil Procedure 26 provides that, unless otherwise limited by

court order,

> [p]arties may obtain discovery regarding any non-privileged matter that is
> relevant to any party's claim or defense and proportional to the needs of the
> case, considering the importance of the issues at stake in the action, the
> amount in controversy, the parties' relative access to relevant information,
> the parties' resources, the importance of the discovery in resolving the
> issues, and whether the burden of expense of the proposed discovery
> outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).  Notably, "[i]nformation within this scope of discovery need not

be admissible in evidence to be discoverable."  Id.  "The scope and conduct of discovery

are within the sound discretion of the district court."  Columbus–Am. Discovery Grp. v.

Atl. Mut. Ins. Co., 56 F.3d 556, 568 n.16 (4th Cir. 1995) (citing Erdmann v. Preferred

Rsch., Inc. of Ga., 852 F.2d 788, 792 (4th Cir. 1988)); see also U.S. ex rel. Becker v.

Westinghouse Savannah River Co., 305 F.3d 284, 290 (4th Cir. 2002) (stating that district

courts are afforded "substantial discretion . . . in managing discovery").

If a party declines to comply with a discovery request, the serving party "may

move for an order compelling an answer, designation, production, or inspection."  Fed. R.

Civ. P. 37(a)(3)(B).  An evasive or incomplete disclosure, answer, or response, "must be

treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(4).  District

courts have "wide latitude in controlling discovery and [their] rulings will not be

overturned absent a showing of clear abuse of discretion."  Ardrey v. United Parcel Serv.,

798 F.2d 679, 683 (4th Cir. 1986); In re MI Windows & Doors, Inc. Prod. Liab. Litig.,

2013 WL 268206, at *1 (D.S.C. Jan. 24, 2013).  "The party resisting or objecting to

discovery 'bears the burden of showing why [the motion to compel] should not be granted.'" Mondragon v. Scott Farms, Inc., 329 F.R.D. 533, 541 (E.D.N.C. 2019) (quoting Mainstreet Collection, Inc. v. Kirkland's, Inc., 270 F.R.D. 238, 241 (E.D.N.C. 2010)).

In his motion to compel, John Doe asks the court to compel Porter-Gaud to fully respond to his requests to admit, to his interrogatories, and to his RFPs. ECF No. 74 at 1. John Doe also moves to compel Porter-Gaud to set forth its Rule 30(b)(2) and Rule 30(b)(6) designees and to produce them for deposition. Id. He contends that more than thirty days have elapsed since he served his discovery requests. Id. He further notes that his counsel has emailed Porter-Gaud's counsel several times advising them of their inadequate responses to these requests. Id.

In response, Porter-Gaud claims that John Doe has exceeded his number of permissible interrogatories, RFPs, and requests to admit. ECF No. 88 at 3–5. Porter-Gaud also argues that it is not its responsibility to label the responsive documents it has produced. Id. at 6. Finally, Porter-Gaud also reiterates many of the arguments it raises in the motion for protective order and contends that those arguments as to attorney-client privilege and work-product privilege apply with equal force to this motion. Id. at 6–8.

For the reasons set forth below, the court concludes that John Doe has asked sixteen interrogatories in his first set of interrogatories, rather than the fifteen he insists he asked, or the forty that Porter-Gaud claims John Doe asked. The court notes that, at the hearing, the parties resolved the "file dump" dispute with regards to labeling responsive documents. ECF No. 100. Finally, to the extent the motion to compel

overlaps with the pending motion for protective order, the court defers ruling on those objections until after it resolves the motion for protective order.

### a. Interrogatory Subparts

Federal Rule of Civil Procedure 33 provides "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. P. 33(a)(1). The key inquiry in counting interrogatories is whether the subparts to an interrogatory are discrete. Id. cmt. 1993 amend. Relevant here, John Doe has served what he believes to be fifteen interrogatories on Porter-Gaud. See ECF No. 76-19. However, Porter-Gaud objects to those interrogatories, in part, because some of the interrogatories have multiple subparts. See id. (objecting to interrogatory 4 (nine subparts), 8 (four subparts), 9 (five subparts), and 10 (eleven subparts)). According to Porter-Gaud's math, John Doe's first interrogatories, when the subparts to the interrogatories are properly accounted for, included forty interrogatories in total, rather than the fifteen enumerated. See id.

John Doe emphasizes that Porter-Gaud has incorrectly self-determined that subparts in John Doe's interrogatories count as additional interrogatories beyond what is permissible and consequently Porter-Gaud "has stopped short of answering many pertinent discovery questions." ECF No. 74 at 2. John Doe requests the court compel Porter-Gaud's complete discovery responses and production of witnesses for deposition. Id. If the court grants his motion, John Doe notes that he will thereafter move for Porter-Gaud to pay his reasonable attorney's fees and expenses as to this motion. Id.

In response, Porter-Gaud first notes that John Doe's filing of a motion to exceed implies that he agrees he has exceeded the limit of twenty-five interrogatories that are

permitted under Fed. R. Civ. P. 33. ECF No. 88 at 3. Porter-Gaud emphasizes that most of John Doe's interrogatories contain numerous subparts—spanning several topics and subject matters—and simultaneously request associated documents. Id. at 4. It claims that John Doe far exceeds the number of interrogatories allowed by Fed. R. Civ. P. 33. Id. In the absence of an order from the court, Porter-Gaud argues that it should not be required to bear the cost and expend the time responding to interrogatories beyond the twenty-five permitted by Fed. R. Civ. P. 33. Id. at 5.

To determine whether subparts to questions should be considered as separate interrogatories, "'[a]n interrogatory containing subparts directed at eliciting details concerning the common theme should be considered a single question, but an interrogatory with subparts inquiring into discrete areas is more likely to be counted as more than one for purposes of limitation." Mezu v. Morgan State Univ., 269 F.R.D. 565, 572–73 (D. Md. 2010) (citations omitted). District courts within the Fourth Circuit apply the test articulated in Kendall v. GES Exposition Services, 174 F.R.D. 684 (D. Nev. 1997). See, e.g., United States ex rel. Adams v. Remain at Home Senior Care, LLC, 2022 WL 168783, at *3 (D.S.C. Jan. 19, 2022). "This lenient standard provides that the court should determine whether a subpart is logically or factually subsumed within and necessarily related to the primary question." Rawl v. S.C. Dep't of Soc. Servs., 2015 WL 6725169, at *2 (D.S.C. Nov. 3, 2015) (internal quotation marks omitted) (quoting Kendall, 174 F.R.D. at 685). Despite the leniency of the standard, courts will still deem a single interrogatory to be multiple interrogatories where it seeks admissions on "many different subjects." See id. at *3 (finding that the defendant's interrogatory requesting the bases for the plaintiff's denials in a request for admission was "really sixty-nine

separate interrogatories because it relate[d] to many different subjects in [the defendant]'s Request for Admission").

When a party is confronted with what it believes to be an excessive number of interrogatories, the appropriate course of action is to either "move for a protective order before answering any interrogatories or 'answer up to the numerical limit and object to the remainder without answering.'" <u>Mondragon</u>, 329 F.R.D. at 541 (quoting <u>Capacchione v. Charlotte-Mecklenburg Sch.</u>, 182 F.R.D. 486, 493 n.4 (W.D.N.C. 1998)). If a party, instead, decides to answer some or all the allegedly excessive interrogatories, it waives its objection that the requesting party has violated Rule 33's limit on the number of interrogatories a party may serve. <u>Id.</u>

A review of the four delineated questions with multiple subparts indicates that those four questions, in fact, constitute five interrogatories.[2] Interrogatory 4, which contains nine subparts, is two interrogatories: (1) inquiry into the specific facts underlying the Porter-Gaud investigation (subparts a–g); and (2) inquiry into the outcome and results of the investigation (subparts h–i). <u>See</u> ECF No. 76-19. Interrogatory 8, which contains four subparts, is one interrogatory seeking to identify and learn about the required policies and procedures for guidance counselors at Porter-Gaud. <u>See id.</u>

---

[2] Porter-Gaud argues that each of the subparts is a distinct interrogatory; but, using that logic, Doe would have used all his twenty-five interrogatories by Interrogatory 10. <u>See</u> ECF No. 76-19. Porter-Gaud continued to answer all subparts of Interrogatory 10, which according to its interpretation, accounted for an additional ten interrogatories. <u>See id.</u> However, for Interrogatories 11 through 15, Porter-Gaud objected based on Doe having exceeded the number of interrogatories permitted by Rule 33 and indicated that "[Doe] has already propounded 35 Interrogatories, ten more than are allowed by the Rule." <u>Id.</u> In responding to ten more than the twenty-five permitted by Rule 33, it is possible that Porter-Gaud has waived its argument based on the number of allowable interrogatories. <u>See</u> <u>Mondragon</u>, 329 F.R.D. at 541.

Interrogatory 9, which contains five subparts, is one interrogatory seeking information as to Porter-Gaud's methodology for contracting with T&M. <u>See id.</u> Finally, Interrogatory 10, which contains eleven subparts, is one interrogatory seeking information as to T&M—and Porter-Gaud's oversight of T&M—after the investigation was underway. <u>See id.</u> Thus, in Doe's first set of interrogatories, he asked Porter-Gaud sixteen interrogatories. To the extent Porter-Gaud objects to an interrogatory because it exceeds the number of interrogatories permitted by Fed. R. Civ. P. 33, that objection is overruled, and the plaintiff's motion to compel is granted.[3] <u>See</u> ECF No. 76-19 ¶¶ 11–15.

### b. Identification of Produced Materials

To the extent that Porter-Gaud has produced 671 documents, John Doe argues that such a production is a duplicative file dump whereby Porter-Gaud fails to explain which documents correspond to which interrogatory or RFP. ECF No. 74 at 1–2. In response, Porter-Gaud addresses John Doe's "file dump" argument by averring that John Doe's request that the school pinpoint what information may be found where in the document production is beyond what Fed. R. Civ. P. 33 requires. ECF No. 88 at 6. As of the date of the response brief, Porter-Gaud had produced fewer than 800 pages of material, and it argues that it is not overly burdensome to require counsel for John Doe to review those documents. <u>Id.</u> At the hearing, the parties each consented to identify which produced documents correspond to which interrogatory or RFP, which resolves the "file dump" argument.

---

[3] The court recognizes that Porter-Gaud raises additional objections to the discovery requests which are not resolved in this order because they are dependent on the court's decision as to the motion for protective order. ECF No. 63. As such, the court's grant of the motion to compel impacts only those questions where the sole objection is that John Doe exceeded the permissible number of interrogatories.

### c. Remaining Arguments

The remaining objections to the interrogatories are that the interrogatories are vague, overly broad, unduly burdensome; seek privileged information, not reasonably calculated to the discovery of admissible evidence; and/or are not proportional to the discovery needs of the case. See generally ECF No. 76-19. The court defers ruling on the remaining arguments in the motion to compel until after it resolves Porter-Gaud's pending motion for protective order, ECF No. 63. It is possible that the court's resolution of the motion to dismiss, ECF No. 70, narrows the scope of the case, such that the parties feel that the motion to compel should be supplemented pending the resolution of the motion for protective order. If so, the parties are directed to confer with each other and advise the court within fourteen (14) days of the filing of this order if they intend to supplement their respective briefs on the remaining arguments in the motion to compel, ECF No. 74.

### 3. John Doe's Motion to Exceed

John Doe moves for leave to serve additional interrogatories in this matter "due to the large volume of witnesses, documents, causes of action and policy and procedures involved in this case." ECF No. 75 at 1. He also moves for leave to exceed the limit of depositions to be taken and seeks to depose twenty-two students, four Porter-Gaud faculty witnesses, two T&M investigators, and possibly the attorney Hal Frampton. Id. In total, John Doe seeks to ask seventy-five interrogatories and to take up to twenty-nine depositions.[4] Id. at 1–2.

---

[4] Federal Rule of Civil Procedure 30(2)(A)(i) limits the number of depositions to be taken to ten.

In response, Porter-Gaud requests the court deny the motion to exceed because John Doe "has failed to establish any cause for the excessive discovery requested." ECF No. 87 at 1. To avoid this discovery dispute, Porter-Gaud claims that it offered to consent to allow John Doe to increase his interrogatories to thirty (30) and depositions to twelve (12) but that he purportedly declined to negotiate. Id. at 2. Porter-Gaud is concerned that John Doe's intended depositions of former students and employees seek to harass and pressure the school, rather than to seek information related to his claims since he has failed to offer any legal argument, much less a showing of good cause, in support of his request. Id.

Upon finding that John Doe has propounded only sixteen interrogatories to date, the court denies without prejudice the motion to exceed the number of interrogatories. Upon considering the parties' arguments as to the interrogatories' subparts, the court notes that John Doe has nine additional interrogatories available to him before reaching the limit imposed by Fed. R. Civ. P. 33(a)(1). If, upon reaching that limit, John Doe again requests leave to exceed the interrogatories permitted by Rule 33, the court will hear his argument at that time. To the extent that John Doe's motion to exceed seeks to depose more than the ten witnesses permitted by Fed. R. Civ. P. 30(2)(A)(i), the court defers ruling on that request until it after resolves the pending motion for protective order.

### 4. John Doe's Motion to Compel Snapchat

John Doe moves to compel Snapchat's records of "communications between Catherine Roe and John Doe from October 2018 to June of 2019." ECF No. 85 at 1. According to documents produced with this motion, John Doe served a subpoena on

Snapchat for these records on November 16, 2023.  See ECF No. 85-1 at 1–4.  On

November 20, 2023, Snapchat sent John Doe's counsel a letter objecting to the subpoena

for several reasons.  Id. at 6–7.  Snapchat argued that (1) John Doe had improperly served

the subpoena by mail; (2) complying with the subpoena would violate the federal Stored

Communications Act ("SCA"), 18 U.S.C. § 2702(a)(1), (2); (3) the subpoena is vague

and overbroad; (4) the subpoena is unduly burdensome; and (5) the subpoena did not give

sufficient time to comply.  ECF No. 85-1 at 6–7.  Snapchat also noted that it is unlikely to

have the records John Doe seeks because they are outside of its retention policy and, to

avoid a potential violation of the SCA, suggested that John Doe seek the communications

directly from the Snapchat users.  Id.

On November 29, 2023, John Doe served another subpoena, this time in person

on Snapchat's agent, for the records from Snapchat.  Id. at 12–16.  Snapchat then sent

another letter to John Doe on December 4, 2023, in which Snapchat reiterated the same

objections it asserted in its response to the first subpoena (except for the objection related

to improper service by mail).  Id. at 17–18.  John Doe then filed his motion to compel

Snapchat's response to his subpoena.  See ECF No. 18.

Rule 45 outlines a specific process through which nonparties, such as Snapchat,

can object to a subpoena by serving written objections on the attorney designated in the

subpoena "before the earlier of the time specified for compliance or 14 days after the

subpoena is served."  See Fed. R. Civ. P. 45(d)(2)(B).  John Doe has not addressed

whether Snapchat's objections comply with Rule 45.  ECF No. 85 at 1.  However, the

court notes that Snapchat's response was timely under Rule 45, see Fed. R. Civ. P.

45(d)(2)(B), and at least one court has suggested that a nonparty properly objects to a

subpoena by emailing the objections to the counsel that served the subpoena, see Miami-Dade Cnty. v. Johnson Controls, Inc., 2011 WL 1548969, at *2–3 (S.D. Fla. Apr. 21, 2011).

Beyond that, as with other civil discovery requests, "the ultimate question is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient." Va. Dep't of Corr. v. Jordan, 921 F.3d 180, 189 (4th Cir. 2019). However, a "more demanding variant of the proportionality analysis" is necessary when subpoenas are issued to nonparties. Id. Among other considerations, "the requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation—or, in appropriate cases, from other third parties that would be more logical targets for the subpoena." Id. The court must also be especially careful when considering the burden of complying with the subpoena and "may consider the interests of the subpoena recipient, as well as others who might be affected." Id. at 190. "For example, if a subpoena seeks information from a business about its customers, it may implicate the business's interest in protecting competitively sensitive information, as well as the customers' interest in protecting their privacy." Id.

Despite Snapchat raising several of these very concerns in its response to John Doe's counsel, John Doe has not addressed any of these considerations in his motion. See ECF No. 85 at 1. For example, he has not indicated whether it would be possible, or perhaps more advisable, to seek information regarding Catherine Roe's Snapchat account from Catherine Roe. See id. Indeed, he has not even indicated how the information he seeks would be relevant to his claims, as required under Rule 26. See

id.  For this reason, the court denies John Doe's motion to compel Snapchat without prejudice.  If John Doe determines that this motion is still necessary after reflecting on the relevant considerations and after reviewing the court's disposition of Porter-Gaud's motion to dismiss, he may refile his motion.

### B. Porter-Gaud's Motion to Dismiss

Having addressed the various pending discovery disputes, the court now turns to Porter-Gaud's motion to dismiss.

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint."  Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.").  To be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A Rule 12(b)(6) motion should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support his claim and would entitle him to relief.  Mylan Lab'ys, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).  When considering a Rule 12(b)(6) motion, the court should accept all well-pleaded allegations as true and should view the complaint in a light most favorable to the plaintiff. Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir. 1999); Mylan Lab'ys, 7 F.3d at 1134. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

Porter-Gaud seeks to dismiss four causes of action: (1) slander & libel and slander & libel per se and by implication, (5) breach of contract both actual and implied, (6) failure to supervise/failure to protect, and (7) promissory & equitable estoppel/specific performance.[5]  ECF No. 70 at 1.  For the following reasons, the court denies Porter-Gaud's motion as to John Doe's defamation cause of action but grants it as to John Doe's breach of contract, failure to supervise, and promissory estoppel causes of action.

## 1. Defamation

John Doe claims that Porter-Gaud defamed him, verbally and in writing, "when it perpetuated a knowingly unprovable falsehood regarding a crime of moral turpitude."  2d Amend. Compl. ¶ 38.  Porter-Gaud seeks to dismiss John Doe's first cause of action because (1) it is barred by the statute of limitations and (2) it fails to state a claim upon which relief may be granted because it does not identify any allegedly false statement made by Porter Gaud.  ECF No. 70 at 3–5.  At the hearing, the court confirmed that Porter-Gaud withdrew its statute of limitations argument.[6]  ECF No. 100.  As such, the

---

[5] Inversely, Porter-Gaud does not seek to dismiss John Doe's claims of (2) negligence, (3) intentional infliction of emotional distress, or (4) the amalgamated constitutional claim of violation of due process, equal protection, and Title IX.

[6] Porter-Gaud withdraws its statute of limitations argument based on the date on which John Doe attained the age of majority.  ECF No. 89 at 2 n.1.  John Doe became emancipated on July 31, 2021, and the suit was filed in May 2022, two months before the tolling period for minors expired.  ECF No. 83 at 4 (citing S.C. Code Ann. § 15-3-40(1)(b)).

court only considers whether John Doe has plausibly stated a cause of action for defamation.

In general, "[t]he tort of defamation allows a plaintiff to recover for injury to h[is] reputation as the result of the defendant's communication to others of a false message about the plaintiff.  Slander is a spoken defamation while libel is a written defamation or one accomplished by actions or conduct."  Holtzscheiter v. Thomson Newspapers, Inc., 506 S.E.2d 497, 501 (S.C. 1998).  The First Amendment limitations on the legal standard applicable to a civil claim for defamation differ based upon: (1) whether the defamed individual is a public figure, public official, limited-purpose public figure, or private figure; and (2) whether the subject matter of the alleged defamatory statement is a matter of public or private concern.[7]  The court therefore begins with a determination of the degree to which the First Amendment is implicated in this case before considering whether John Doe's allegations are sufficient to state a claim under the applicable defamation standard.  See Erickson v. Jones St. Publishers, LLC, 629 S.E.2dd 653, 666 & n.8 (S.C. 2006).

---

[7] The United States Supreme Court has held that the First Amendment places limitations on tort liability for defamation in certain circumstances. See, e.g., Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, 776–77 (1986) (holding that when a plaintiff is a private figure and the speech is a matter of public concern, the First Amendment requires the plaintiff to prove falsity of the statement); Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761 (1985) (holding that where speech involves no matters of public concern, "the state interest adequately supports awards of presumed and punitive damages-even absent a showing of 'actual malice'"); New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964) (concluding that the First Amendment prevents a "public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not").

### a. First Amendment Concerns

At the hearing, both parties stipulated that John Doe was a private figure. ECF No. 100. In cases in which the plaintiff is a private figure, the defamation action is analyzed primarily under the common law. Erickson, 629 S.E.2d at 664. Under South Carolina law, a private figure defamation plaintiff must show "common law malice." Tharp v. Media Gen., Inc., 987 F. Supp. 2d 673, 680 (D.S.C. 2013). "[C]ommon law malice under South Carolina defamation law generally 'means that the defendant was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff, or that the statements were published with such recklessness as to show a conscious indifference toward plaintiff's rights.'" Id. (quoting Jones v. Garner, 158 S.E.2d 909, 914 (S.C. 1968)).

Likewise, the parties also stipulated at the hearing that the alleged speech underlying the defamation claim was about a private-matter, rather than a matter of public concern. ECF No. 100. This court has previously followed other courts in this district that have determined that private-person and private-matter speech must be provably false to be actionable under defamation law. Leask v. Robertson, 589 F. Supp. 3d 506, 522 (D.S.C. 2022); see also Davis v. New Penn Fin., LLC, 2021 WL 3410790, at *17 (D.S.C. May 25, 2021), report and recommendation adopted, 2021 WL 3088059 (D.S.C. July 22, 2021) (citation omitted) ("The First Amendment imposes limitations based on the subject of the alleged defamation as well as the type of speech at issue."). The second amended complaint, read in the light most favorable to John Doe, indicates that Porter-Gaud's questioning of students about John Doe's alleged rape of Roe is provably false and therefore actionable under defamation law. See Leask, 589 F. Supp. 3d at 522. Thus, upon the parties' stipulation that the alleged speech concerns a private

figure about a private matter, the court evaluates whether John Doe has plausibly alleged the common law elements of a defamation cause of action.

### b.   Common Law Defamation Elements

To establish a common law defamation claim, "a plaintiff must prove: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable regardless of harm or the publication of the statement caused special harm." Garrard v. Charleston Cnty. Sch. Dist., 838 S.E.2d 698, 709 (S.C. Ct. App. 2019), aff'd in part and vacated in part on other grounds sub nom. Garrard ex rel. R.C.G. v. Charleston Cnty. Sch. Dist., 890 S.E.2d 567 (S.C. 2023).  The court will take each of these elements in turn, ultimately finding that John Doe has plausibly stated a claim for defamation and denying this portion of Porter-Gaud's motion accordingly.

### i.   False and Defamatory Statement

For a plaintiff to prevail, the alleged statement must be both false and defamatory. Id.  First, "[t]he publication of a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Fleming v. Rose, 567 S.E.2d 857, 860 (S.C. 2002).  "It is the trial court's function to determine initially whether a statement is susceptible of having a defamatory meaning." Lane v. Hilton Worldwide, Inc., 2012 WL 1191648, at *3 (D.S.C. Feb. 28, 2012), report and recommendation adopted, 2012 WL 1192065 (D.S.C. Apr. 10, 2012) (internal quotation marks and citation omitted).  "The Court will not hunt for a forced and strained construction to put on ordinary words, but will construe them fairly, according to their natural and reasonable import, in the plain

and popular sense in which the average reader naturally understands them." <u>Timmons v. News & Press, Inc.</u>, 103 S.E.2d 277, 280–81 (S.C. 1958). In other words, there is a presumption of falsity but "no presumption of defamation." <u>Id.</u> at 281. "A statement is classified as defamatory <u>per se</u> when the meaning or message is obvious on its face." <u>Id.</u> "A statement is classified as defamatory <u>per quod</u> when the defamatory meaning is not clear unless the hearer knows facts or circumstances not contained in the statement itself, and the plaintiff must introduce extrinsic evidence to prove the defamatory meaning." <u>Id.</u>; <u>see also</u> <u>Neloms v. Charleston Cnty. Sch. Dist.</u>, 2019 WL 6092279, at *13 (D.S.C. June 19, 2019), <u>report and recommendation adopted</u>, 2019 WL 4409459 D.S.C. Sept. 16, 2019) ("Defamation may also be accomplished through inference, implication, innuendo or insinuation, as well as through direct reference."). Second, "[u]nder common law, a defamatory communication was presumed to be false, but truth could be asserted as an affirmative defense." <u>Parrish v. Allison</u>, 656 S.E.2d 382, 391 (S.C. Ct. App. 2007) (citing <u>Beckham v. Sun News</u>, 344 S.E.2d 603, 604 (S.C. 1986)). If there is a dispute regarding the truth of the defamatory statement, it is a question for the jury to determine. <u>Weir v. Citicorp Nat'l Servs., Inc.</u>, 435 S.E.2d 864, 867 (S.C. 1993).

Porter-Gaud argues that the only alleged defamatory statement it made was that "it investigated claims of sexual assault by Catherine Roe against John Doe" and that John Doe appears to allege that the school's statement was "the alleged failure to 'correct falsehoods' and publish the results of that investigation." ECF No. 70 at 5. Porter-Gaud urges the court to find that it did not make a "statement" and that silence cannot amount to defamatory conduct. <u>Id.</u> In response, John Doe argues that he is not accusing Porter-Gaud of silent defamation; rather, he claims that the school defamed him "when it

23

queried a quarter of the 2022 graduating class about the rape."  ECF No. 83 at 6 n.18.  In reply, Porter-Gaud asserts that, interpreted liberally, John Doe's complaint only reads that "Porter-Gaud engaged in an investigation of [John Doe] for sexual assault which caused third-parties to gossip and also failed to address the gossip."  ECF No. 89 at 3.

The court disagrees with Porter-Gaud and finds that, read liberally, the second amended complaint alleges that the defamation occurred during the school's questioning of a large number of John Doe's peers and their parents as to his alleged rape and harassment of Roe, and the second amended complaint incorporates these allegations by reference in its the section on the defamation cause of action.  See 2d Amend. Compl. ¶¶ 23 ("[S]tudents and parents called the Doe family to let them know that they were all being mandatorily made to be interviewed and to give statements to investigators about what they witnessed between Roe and Doe."), 25 ("He and his family felt like outcasts and were deeply ashamed and embarrassed because of the public nature of the sexual allegations that were not public until [Porter-Gaud] officials made them so by calling for such an expansive investigation into the false allegations."), 37 ("[John Doe] re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs herein verbatim.").

While a review of some of the T&M material remains pending, the court resolves the motion to dismiss by looking to the allegations in the complaint in the light most favorable to John Doe.  He alleges that Porter-Gaud perpetuated the lie that he raped Roe during the investigation and questioning various Porter-Gaud students and parents regarding the falsehood.  2d Amend. Compl. ¶¶ 37–38.  It is unclear whether the falsehood was obvious on its face (e.g., "what do you know about Doe's rape of Roe?")

or if it was implied through inference (e.g., "what do you know of Doe and Roe's relationship?" combined with different treatment of the two persons, where John Doe's privileges are revoked and Roe's privileges are not). In any event, the court finds that John Doe's allegations plausibly meets this first element of his claim.

### ii. Unprivileged Publication to a Third Party

Under South Carolina law, publication—that is, communication—of a defamatory statement can be privileged or unprivileged. Bell v. Bank of Abbeville, 38 S.E.2d 641, 642–43 (S.C. 1946). If publication is privileged, that privilege can provide a defense to a defamation cause of action. Id. at 642. To determine if a statement is privileged, the court must consider, among other things, the relationship between the parties. Id. at 643. John Doe's amended complaint neglects to explicitly allege that Porter-Gaud's publication of the defamatory statements was unprivileged. See generally 2d Amend. Compl. Beyond that, under South Carolina law, privilege is an affirmative defense, see Swinton Creek Nursery v. Edisto Farm Credit, ACA, 514 S.E.2d 126, 134 (S.C. 1999) ("In a defamation action, the defendant may assert the affirmative defense of conditional or qualified privilege."), and the court need not consider any affirmative defense that the publication was privileged in this order, see Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) ("[A] motion to dismiss . . . generally cannot reach the merits of an affirmative defense . . . [unless] all facts necessary to the affirmative defense 'clearly appear[] on the face of the complaint.'") (quoting Richmond, Fredericksburg & Potomac R.R. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993) (emphasis omitted)).

25

### iii. Fault

The second amended complaint alleges that the defamatory statements were made by Porter-Gaud's agent T&M in its investigation of John Doe's alleged rape of Roe during its questioning of Porter-Gaud's students alongside their parents.  See 2d Amend. Compl. ¶¶ 23, 25.  There are unsettled questions because Porter-Gaud itself did not make the statements—T&M allegedly made them during its investigation.  However, T&M was an agent of Gordon Rees, who was the attorney for Porter-Gaud, and therefore it is plausible that T&M made the statements as an agent of Porter-Gaud.[8]  Yet neither party identifies the issue of agency law, and the court need not venture into undisputed territory and needlessly complicate the matter.  For the purposes of this motion to dismiss, this third element is met.

### iv. Actionability or Special Harm

"Slander is actionable per se when the defendant's alleged defamatory statements charge the plaintiff with one of five types of acts or characteristics: (1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or profession."  Goodwin v. Kennedy, 552 S.E.2d 319, 322–23 (S.C. Ct. App. 2001).  When a defamatory statement is actionable per se, the plaintiff need not prove general damages—as these damages are presumed—and the defendant is presumed to have acted with common law malice.  See Fountain v. First

---

[8] This issue of agency features prominently in the parties' briefs on the motion for protective order where Porter-Gaud asserts attorney-client privilege for the sought discovery against T&M because T&M purportedly was Porter-Gaud's attorney's agent.  See, e.g., ECF No. 63 at 3–5.  The court is not resolving that motion or issues of agency at this time but simply notes that, based on those representations, the element of fault is plausibly stated even though T&M, not Porter-Gaud, conducted the interviews.

Reliance Bank, 730 S.E.2d 305, 309 (S.C. 2012). "Whether the statement is actionable

per se is a matter of law for the court to resolve." Id.

A crime of moral turpitude is a term of art that has been defined by South

Carolina law, and whether an offense qualifies as a crime of moral turpitude is a question

that is appropriate for the courts. See State v. Yates, 310 S.E.2d 805, 810 (S.C. 1982),

overruled on other grounds by State v. Torrence, 406 S.E.2d 315 (S.C. 1991). "South

Carolina has applied a traditional framework, defining moral turpitude as 'an act of

baseness, vileness, or depravity in the private and social duties which a man owes to his

fellow man, or to society in general, contrary to the accepted and customary rule of right

and duty between man and man.'" Baddourah v. McMaster, 856 S.E.2d 561, 571 (S.C.

2021) (quoting State v. Horton, 248 S.E.2d 263, 263 (S.C. 1978)). Some offenses which

have been deemed crimes involving moral turpitude in South Carolina include:

> accessory to bank robbery, arson, assault and battery with intent to kill,
> assault with intent to rape, assault with intent to ravish, auto theft, breaking
> into a motor vehicle with intent to steal, conspiracy to obtain property under
> false pretense, criminal sexual conduct with a minor (any degree), failure to
> yield right of way, hit and run, housebreaking and larceny, larceny,
> manufacture of marijuana, possession of marijuana with intent to distribute,
> receiving stolen goods, robbery, sale of controlled substances, sale of
> narcotics, and tax fraud.

Baddourah, 856 S.E.2d at 572; accord State v. McFarlane, 306 S.E.2d 611, 614 (S.C.

1983) ("[C]riminal sexual conduct with a minor in any degree is a crime of moral

turpitude."). The alleged defamatory statements at issue were T&M's questions during

the school's investigation that may have implied, or expressly stated, that John Doe raped

Roe, who were both minors at the time. Rape is a crime involving moral turpitude and

therefore John Doe has alleged slander that is actionable per se, such that the fourth element is met.[9]

In sum, John Doe claims that he has plausibly stated a claim for defamation: (1) Porter-Gaud's rape-related questioning was false and defamatory either per se or per quod; (2) it was a statement made to the third-parties of Porter-Gaud parents and students; (3) Porter-Gaud is at fault for authorizing its agent to pursue the investigation in which the defamatory statements were made; and (4) the slander is per se actionable but even if it were not, John Doe has plausibly stated that the defamatory statements caused him general harm in that he was ostracized from his friends and peers at the school. See ECF No. 83 at 4–7. The court agrees and denies the motion to dismiss as it relates to John Doe's defamation cause of action.

### 2. Failure to Supervise / Failure to Protect

Porter-Gaud notes that it could not find any cases which provide that a private school may be liable for a failure to supervise a student. ECF No. 70 at 6. As best Porter-Gaud can tell, John Doe premises this cause of action on Roe's conduct, rather than any action by the school. Id. According to Porter-Gaud, it had no duty to supervise Catherine Roe—because she was not an employee—and therefore the court should dismiss this cause of action. Id. In response, John Doe "concedes that the failure to supervise claim applies only to employees." ECF No. 83 at 8. He nevertheless argues that "the supervisory failure should be subsumed within [his] negligence claims." Id. In

---

[9] Porter-Gaud argues that it did not defame John Doe; rather, if anyone defamed him it was Ms. Roe. ECF No. 70 at 4–5. While John Doe agrees that Roe defamed him, such an interpretation misses the mark because the school officials allegedly also may have perpetuated the lie, which is actionable defamation. ECF No. 83 at 6.

reply, Porter-Gaud asks the court to unequivocally dismiss John Doe's failure to supervise claim. ECF No. 89 at 4. It argues that John Doe did not allege that Porter-Gaud failed to supervise any employee and therefore a required element of the claim is not met. Id.

The court agrees with Porter-Gaud and concludes that John Doe has not pleaded a plausible cause of action for failure to supervise. 2d Amend. Compl. ¶¶ 53–58 (alleging that Porter-Gaud failed to supervise Roe). An employer may be liable for negligent supervision when (1) its employee intentionally harms another when he or she is on the employer's premises, is on premises he or she is privileged to enter only as employee, or is using the employer's chattel; (2) the employer knows or has reason to know it has the ability to control the employee; and (3) the employer knows or has reason to know of the necessity and opportunity to exercise such control. Degenhart v. Knights of Columbus, 420 S.E.2d 495, 496 (S.C. 1992). In the context of schools, a failure to supervise claim is brought against employees of the school such as teachers or school administrators, not students. See, e.g., Bar v. Bd. of Trs. of Clarendon Cnty. Sch. Dist. No. 2, 462 S.E.2d 316, 321 (S.C. Ct. App. 1995); Doe v. Berkeley Cnty. Sch. Dist., 2015 WL 7722425, at *14 (D.S.C. Nov. 30, 2015). Students are not employees of the schools they attend. See McKnight v. State of La. Bese Bd., 242 F. App'x 141, 141 (5th Cir. 2007) (finding that plaintiff failed to state a claim under Title VII "since a student is not considered an employee of a school."); McGuinness v. Univ. of N.M. Sch. of Med., 170 F.3d 974, 979 (10th Cir. 1998) ("Unless a student receives remuneration for the work he performs, he is not considered an employee.").

Though the court dismisses this cause of action for failure to state a claim, it notes John Doe's request and subsumes John Doe's arguments raised under this cause of action into John Doe's negligence claim because failure to supervise generally falls under the negligence umbrella.  ECF No. 83 at 8; see also, e.g., Hollins ex rel. Hollins v. Richland Cnty. Sch. Dist. One, 427 S.E.2d 654 (S.C. 1993); Duncan ex rel. Duncan v. Hampton Cnty. Sch. Dist. No. 2, 517 S.E.2d 449 (S.C. Ct. App. 1999); Doe ex rel. Roe v. Orangeburg Cnty. Sch. Dist. No. 2, 495 S.E.2d 230 (S.C. Ct. App. 1997), aff'd as modified, 518 S.E.2d 259 (S.C. 1999); Smart ex rel. Clark v. Hampton Cnty. Sch. Dist. No. 2, 432 S.E.2d 487 (S.C. Ct. App. 1993).

### 3. Breach of Contract (Actual and Implied)

To establish breach of contract under South Carolina law, a plaintiff must establish three elements: (1) a binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damage as a direct and proximate result of the breach.  See King v. Carolina First Bank, 26 F. Supp. 3d 510, 517 (D.S.C. 2014) (applying South Carolina law).  Damages recoverable for a breach of contract must either flow as a natural consequence of the breach or must have been reasonably within the parties' contemplation at the time of the contract.  Hawkins v. Greenwood Dev. Corp., 493 S.E.2d 875, 880 (S.C. Ct. App. 1997); Morningstar Fellowship Church v. York Cnty., 2018 WL 2979771, at *1 (S.C. Ct. App. June 13, 2018).  To prevail on a breach of contract claim, the plaintiff bears the burden of establishing the three elements of that claim.  See Ferguson v. Waffle House, Inc., 18 F. Supp. 3d 705, 731 (D.S.C. 2014) (citing Fuller v. E. Fire & Cas. Ins. Co., 124 S.E.2d 602, 610 (S.C. 1962)).

The court notes that many of the arguments John Doe raises in support of this claim were already ruled on—and rejected—by the court.  Indeed, many of his arguments seem more suited for a motion to reconsider, rather than in support of the plausibility of his pleadings.  For this reason, the court will start by briefly outlining its prior rulings as to breach of contact in this case.  After that, the court will explain John Doe's most recent arguments and why those arguments do not alter the court's previous conclusions.

### a.  The Court's Prior Rulings

First, in the court's order on the first motion to dismiss, the court held—in the context of a negligence claim premised on a breach of contractual duty—that it was dubious as a matter of law whether a contract existed between the Does and Porter-Gaud. ECF No. 28 at 10–15.  The court first noted that there was no express contract, and the only possible contract would be one implied-in-fact that arises from the payment of tuition in exchange for education.  Id.  Thereafter, the court observed that Mary Doe failed to specify what exact contractual provision that Porter-Gaud violated, such that the court granted the motion to dismiss the negligence claim premised on breach of contractual duty.  Id.

Second, in the court's order resolving the Does' motion for reconsideration of the first motion to dismiss, the court reiterated its skepticism of the merits of the Does' negligence claim grounded in an implied breach of contract theory and denied the motion to reconsider.  ECF No. 36 at 5–7 & n.2.

Third, in the court's order on the Does' motion to amend, the court assessed whether Mary Doe's breach of contract claim would be futile.  ECF No. 60 at 29–30.

The court considered the express language of the Porter-Gaud Handbook[10] and ultimately found that the handbook and tuition together did not create an implied-in-fact contract. Id. That is because the Porter-Gaud Handbook contains an express disclaimer that provides, "The guidelines and policies outlined in this handbook are not part of the enrollment contract and do not confer any contractual rights on any party." Id. (citing ECF No. 51-2 at 3). In these previous rulings, the court relied heavily on Hendricks v. Clemson University, 578 S.E.2d 711 (S.C. 2003), in which the South Carolina Supreme Court ruled that a student's payment of tuition alone does not create an implied-in-fact contract. ECF Nos. 28 at 12–13; 60 at 29–30.

### b. John Doe's New Arguments

John Doe essentially raises three points when arguing that there was a contract in this case. First, he starts with the general proposition that, despite the court's previous rulings otherwise, following the South Carolina Supreme Court's ruling in Hendricks does not necessitate finding that there was no contract in this case. ECF No. 83 at 8–11. Second, John Doe analogizes to more recent cases involving school faculty employment. Id. at 11–16. He contends that, based on the reasoning in these cases, the South Carolina Supreme Court might decide Hendricks differently if presented with the same issues today. Id. at 11. Moreover, he argues that the reasoning in these cases show that various documents (Porter-Gaud's student handbook, enrollment contract, and signature page),

---

[10] John Doe provides various sections of the Porter-Gaud handbook as attachments to his response in opposition. See, e.g., ECF Nos. 83-4; 83-5; 83-6; 83-7; 83-8; 83-9; 83-10. However, in his response in opposition to Porter-Gaud's motion for protective order, John Doe provides the handbook in its entirety with its appendices. See ECF No. 76-5. For continuity purposes, the court cites to the attachment which includes the handbook in its entirety and references the ECF page number when it cites to portions of the handbook. See id.

when taken together, form a contract and include specific promises made by Porter-Gaud. Id. at 11–16.  Third, he avers that the student handbook includes mandatory, rather than discretionary language.  Id. at 16.  The court will take each of these three issues in turn.

### c.  Analysis

First, the court finds that John Doe's breach of contract claim must be dismissed because he has not alleged the existence of a contract, whether express or implied. Preliminarily, there is no express contract because the alleged contract of paying tuition and sending a child to school is not manifested by words, oral or written, and thus the contract in this case would, at best, be one that is implied-in-fact.  See Stanley Smith & Sons v. Limestone Coll., 322 S.E.2d 474, 477 (S.C. 1984).

For an implied-in-fact contract to be valid, "[t]he parties must manifest their mutual assent to all essential terms of the contract in order for an enforceable obligation to exist."  Id. (citing Edens v. Laurel Hill, Inc., 247 S.E.2d 434 (S.C. 1978)).  No South Carolina state court nor district court has definitively found that the payment of tuition by itself creates an implied-in-fact contract.  See Hendricks, 578 S.E.2d at 716–17 (finding no implied-in-fact contract between the student and university to ensure the student's NCAA eligibility for baseball because the plaintiff did not point to an identifiable contractual promise that the school failed to honor).  In Hendricks, which the court reiterates is binding caselaw on this issue until revisited by the South Carolina Supreme Court, the court noted that "not all aspects of the student/university relationship are subject to a contract remedy."  Id. at 716.  The court specifically found that, to state a breach of contract claim, the plaintiff must point to an identifiable contractual promise that the university has failed to honor.  Id. at 717.

John Doe has not pointed to any promise in the second amended complaint other than what he already alleged in the first amended complaint. At most, John Doe provides that,

> As part of the self-termed contracts, [Porter-Gaud] agreed to not show favoritism or preferred treatment to one student over another, to not discriminate on the basis of gender, agreed to investigate claims of violence or harassment and to put an end to such behavior, to provide a safe learning environment, to call authorities and report violations of the law, to follow the written disciplinary process, to provide counseling services to its students in need, to not to tolerate bullying and to not retaliate against students or parents as well as other agreements and promises set forth in the contract(s) and other controlling documents attached hereto.

2d Amend. Compl. ¶ 49. While he attached the entire handbook to the second amended complaint, he has again failed to identify specific provisions within it that have been breached.[11]  See generally id. ¶¶ 47–52. As this court has noted on multiple occasions, the Porter-Gaud handbook contains an express disclaimer which prevents the court from finding the handbook to form an implied contract.[12]

---

[11] John Doe merely indicates that he "has alleged that he was not provided with specific services promised by the school within the handbook and because of that he suffered identifiable damages such as costs of hiring an attorney, costs of therapy, costs of a gym membership and the loss of his reputation." ECF No. 83 at 10. He does not clarify which specific services he was not provided to which he was entitled according to the handbook. See id.

[12] To reiterate the court's previous rulings on this issue, on the table of contents of the handbook, Porter-Gaud provided a disclaimer which states:

> BEING A PART OF THE PORTER-GAUD COMMUNITY IS A PRIVILEGE, NOT A RIGHT. THE GUIDELINES AND POLICIES OUTLINED IN THIS HANDBOOK ARE NOT PART OF THE ENROLLMENT CONTRACT AND DO NOT CONFER ANY CONTRACTUAL RIGHTS ON ANY PARTY. THE POLICIES AND PROCEDURES SET FORTH IN THIS HANDBOOK REPLACE ALL PRIOR INCONSISTENT POLICIES, WRITTEN AND ORAL. FROM TIME TO TIME IT WILL BE NECESSARY FOR PORTER-GAUD TO CHANGE, DELETE OR ADD TO THIS HANDBOOK. THE EFFECTIVE MANAGEMENT OF A SCHOOL COMMUNITY REQUIRES THAT THE SCHOOL HAVE BROAD DISCRETION IN ADDRESSING INDIVIDUAL

Second, the court finds that its first conclusion—that there is no contract in this case—is not altered by the employment law cases John Doe cites. As best the court can tell, John Doe cites to <u>Sheppard v. Visitors of Virginia State University</u>, 993 F.3d 230, 239 (4th Cir. 2021), to show that a plaintiff arguing an implied in fact contract under Virginia law could make that argument by referencing Virginia state courts' interpretations of references to educational handbooks in general, including in analysis of breach of faculty contracts. <u>See</u> ECF No. 83 at 14. In <u>Sheppard</u>, the court considered state court decisions concerning educational handbooks to find that students do not have implied-in-law contracts with their universities based on their handbooks or codes of

---

CIRCUMSTANCES AND SITUATIONS THAT ARISE IN THE LIFE OF THE SCHOOL SO AS TO CARRY OUT THE SCHOOL'S MISSION.

ECF No. 76-5 at 4 (emphasis added). To the extent John Doe attempts to craft an implied-in-fact contract out of purported breaches of the handbook, such an attempt is foreclosed by this explicit and unambiguous language. <u>See</u> ECF No. 62-1 at 3. John Doe has previously attempted to overcome that disclaimer by reference to the cover letter which provides, "It is our hope then that this Handbook provides our community not only with routine information, but also serves to document our core beliefs, our goals, and our expectations and procedures. It is our contract with each other." <u>Id.</u> at 1. This language is aspirational, rather than mandatory, and the court found that it did not overcome the express disclaimer in the handbook.

John Doe specifically disagrees with the court's analysis of the handbook as being non-realized goals or aspirations, but, yet again, he fails to identify specific language that would create a contract. ECF No. 83 at 16. He claims that "in the school disciplinary context, when a document contains mandatory versus discretionary language, it is no longer a goal or aspiration. It is a mandate and a promise of procedure and it clearly applied to Mr. Doe." <u>Id.</u> His arguments focus on the second element of a breach of contract claim—breach—rather than the missing first element—contract formation. <u>See id.</u> This misses the mark because the court's previous motions addressed Mary Doe's failure to establish contract formation, without reaching breach of contract. ECF Nos. 60 at 29; 62-1 at 1. The court must first find that there is a contract before it finds that the contract has been breached. <u>King</u>, 26 F. Supp. 3d at 517. The analysis the court has provided in its many orders has related to the first question and consistently found that the Does have not plausibly stated that the handbook formed a contract, such that the alleged breach of the handbook is not actionable. ECF Nos. 28 at 13; 36 at 5–6; 60 at 29–30.

conduct under Virginia law.  See 993 F.3d at 239–40.  Generously construing Sheppard, it is likely that the Fourth Circuit included reference to faculty handbook cases because of the novelty of the plaintiff's argument and to show that even had the plaintiff in the case properly supported his argument with caselaw, that caselaw would not be in favor of the plaintiff's position.  See id.  Thus, John Doe's suggested analysis presumes that students' contractual rights with their educational institutions parallels that of the institution's actual employees, which is a large leap of logic.[13]  A student is not an employee of his school, and therefore this context—and the nuanced tests that have arisen in implied contract cases under employment law—are inapplicable to the instant facts, both in the breach of contract and in the promissory estoppel causes of action.[14]  See McKnight, 242 F. App'x at 141; McGuinness, 170 F.3d at 979.

Even assuming that John Doe's interpretation of Sheppard is correct—in that faculty employment cases are persuasive on the question of contract formation—and applying that logic to this case, the court finds that analysis of faculty employment law in South Carolina does not meaningfully change the court's opinion on John Doe's breach of contract claim.  John Doe cites to South Carolina faculty handbook cases that do not move the needle in his case.  ECF No. 83 at 8–15.  John Doe's citation to Crenshaw v.

---

[13] As best the court can tell, John Doe premises his incorporation of employment law on the Fourth Circuit decision in Sheppard, where the Fourth Circuit considered Virginia law to determine whether a student had an implied contract with the university based on its student's code of conduct, ultimately finding that Virginia state law did not support the student's argument that it did.  993 F.3d at 239.  Given that the court is applying South Carolina law, Sheppard's applicability is questionable at best, but even if it were applicable to these facts, it would not change the court's calculus.

[14] John Doe similarly argues that the disclaimer is not valid because it does not comply with S.C. Code Ann. § 41-1-110.  ECF No. 83 at 14.  This statute concerns disclaimers of an employment contract, see S.C. Code Ann. § 41-1-110, and the court rejects this argument for this reason.

Erskine College is of little help because the South Carolina Supreme Court expressly noted the uniqueness of the decision, stating "the role of the granting of tenure in our analysis of whether the faculty manual is a contract with tenured faculty probably <u>renders this analysis inapplicable in any other context</u>." 850 S.E.2d 1, 11 (S.C. 2020) (emphasis added). In other words, the Faculty Manual was found to be a contract only because of the specific and unique promises inherent in the grant of tenure to a professor. <u>Id.</u> at 10–11. In that case, the South Carolina Supreme Court reiterated its consistent position that it "ha[s] required that courts be reluctant to find an employee handbook or manual to be a contract as a matter of law <u>when the purported contract document contains a disclaimer provision</u>." <u>Id.</u> (emphasis added). Rather that providing new authority, <u>Crenshaw</u> supports this court's previous finding that Porter-Gaud's student handbook did not create an implied contract in the context John Doe requests.

Undeterred, John Doe cites to recent decisions from the District of South Carolina that considered faculty handbooks and disclaimers in the employment context. ECF No. 83 at 13. In <u>Bowers v. University of South Carolina</u>, the magistrate judge found that the defendant school did not produce a faculty handbook that included any disclaimer, much less a conspicuous disclaimer, that satisfied the statutory requirements concerning employment handbooks. 2023 WL 5753633, at *30 (D.S.C. July 6, 2023). That action was brought by a plaintiff instructor who identified herself as a senior instructor with a contract, and the reappointment letter—which served as the employment contract—indicated that the appointment was subject to the terms and conditions set forth in the Faculty Manual. <u>Id.</u> at *28. The magistrate judge reached the same conclusion in the analogous case <u>Misenheimer v. University of South Carolina</u>, when it held that "no

disclaimer language is included in the record's versions of either The Faculty

Manual . . . or EOP 1.02." 2023 WL 6651134, at *24 (D.S.C. July 27, 2023). These two

cases are easily distinguishable because the handbooks at issue in those cases did <u>not</u>

contain disclaimers and their failure to do so created the opportunity for a contract to be

formed pursuant to unambiguous state law. <u>See</u> <u>id.</u>; <u>Bowers</u>, 2023 WL 5753633, at *30;

S.C. Code Ann. § 41-1-110.

Third, the court is not convinced by John Doe's argument regarding mandatory

versus persuasive language. The closest John Doe comes to identifying a specific

promise that was breached is when he argues that there is mandatory language in the

harassment and discrimination sections of Porter-Gaud's handbook. <u>See</u> ECF No. 83 at

10–16 & n.27. At the hearing, John Doe argued that the specific provisions in the Porter-

Gaud handbook regarding discrimination, harassment, and procedures arising from

discrimination and harassment were sufficiently specific that they constituted "promises"

sufficient for this claim to survive the motion to dismiss. ECF No. 100 (referencing ECF

No. 76-5 at 71–72 (handbook harassment and abuse policy summary), 79–81 (Appendix

D: Harassment / Abuse), 82–83 (Appendix E: Reporting Responsibilities, Investigation

and Complaint Resolution for Protected Status Discrimination and/or

Harassment/Abuse).[15]

---

[15] John Doe makes this argument in his breach of contract section in his response
in opposition, when he argues that the Porter-Gaud handbook contains mandatory
language which, he argues, should be interpreted as a promise of procedure. <u>See</u> ECF
No. 83 at 16. He relies on this argument when he declares that "a jury should decide
whether John Doe had a right to rely upon the school policies and whether the school's
disciplinary process was fundamentally fair." ECF No. 83 at 20.

As with John Doe's other arguments, courts have performed this analysis of mandatory versus permissive language only in certain breach of contract actions arising in the <u>employment</u> context.  <u>See, e.g.</u>, <u>Misenheimer</u>, 2023 WL 6651134, at *25–26; <u>Bowers</u>, 2023 WL 5753633, at *29–32 (D.S.C. July 6, 2023); <u>Anthony v. Atl. Grp. Inc.</u>, 909 F. Supp. 2d 455, 467–69 (D.S.C. 2012), <u>aff'd</u>, Case No. 12-2538 (4th Cir. July 12, 2013); <u>Crenshaw</u>, 850 S.E.2d at 14.[16]  The reason this issue arises in the employment context is that under South Carolina law, an employee handbook that includes mandatory language, promising specific treatment in specific situations, can create an issue of fact of whether an implied contract exists, particularly in the absence of a disclaimer in the handbook.  <u>See</u> <u>Lord v. Kimberly-Clark Corp.</u>, 827 F. Supp. 2d 598, 601–02 (D.S.C. 2011); <u>Misenheimer</u>, 2023 WL 6651134, at *25 ("However, finding the disclaimer is not conspicuous as a matter of law does not end the court's analysis.  Plaintiff must also identify portions of the Handbook that are mandatory, are applicable to her, and were breached.").

Even if these concepts of employment law were relevant to identifying a contact between a school and student, John Doe has not identified mandatory language—or even

---

[16] John Doe also cites to <u>Bass v. Miss Porter's School</u>, 738 F. Supp. 2d 307 (D. Conn. 2010).  ECF No. 83 at 15.  The court omits analysis of this case because it arises under Connecticut law and is not persuasive in this matter.  Though that case concerned the expulsion of a student by his school, the court considered whether there was breach of express or implied contracts under Connecticut law.  <u>Bass</u>, 738 F. Supp. 2d at 320–26.  To the extent John Doe contends it is applicable, the court notes that it provides the same principle that this court has reiterated thrice: that a breach of contract claim may be presented against a school only if the student presents a specific, identifiable promise by the school that the school has breached.  <u>Id.</u> at 324.  The court reiterates that John Doe has not identified that Porter-Gaud has breached a specific, identifiable promise.  As such, even if the court were to apply the logic from Connecticut state law to these facts, it would not change the court's calculus and ultimate conclusion that John Doe has failed to plausibly state a claim for breach of contract.

a mix of mandatory and permissive language—that creates a jury question on whether there was an implied contract.  See Misenheimer, 2023 WL 6651134, at *25 ("The court can, absent ambiguity, determine that the subject language is mandatory when it is 'definitive in nature, promising specific treatment in specific situations.'").  The language in Porter-Gaud's harassment/abuse sections and appendices of the handbook includes permissive language, not mandatory language.  For example, in the summary of reporting responsibilities, investigation and complaint resolution policy for protected status discrimination and/or harassment/abuse, the school indicated that "[u]pon receipt of the report [of harassment/abuse], Porter-Gaud may take such immediate actions as it deems appropriate . . . including but not limited to separating, suspending and/or questioning and/or preliminary disciplinary of the individual(s) involved."  ECF No. 76-5 at 71 (emphasis added).

The handbook goes on to provide that "[i]f an investigation determines that a person has harassed another, the School takes disciplinary, corrective and/or responsive action as it determines appropriate, which may include suspension or expulsion from the School."  Id. at 72 (emphasis added).  Rather than unambiguously setting out mandatory procedures, the handbook indicates that Porter-Gaud reserved to itself the discretion to appropriately handle each instance of harassment/discrimination according to the specific facts of the report.  See id.  Similarly, Appendix D reserves discretion to the school in its handling of harassment and/or abuse, see id. at 81 ("Porter-Gaud, at its discretion, may suspend or otherwise separate from regular classes any student accused or suspected of harassment or abuse as defined herein."); see also id. (noting that corrective actions will be taken "at the sole discretion of Porter-Gaud" and specifying disciplinary actions that

40

the school "may" take), and Appendix E provides Porter-Gaud with a level of discretion in handling complaints of harassment and/or abuse, see id. at 82–83 ("Upon receipt of the report, Porter-Gaud may take such immediate actions as it deems appropriate."). This language is permissive, rather than mandatory, and therefore cannot serve as the unambiguous promise underlying John Doe's promissory estoppel cause of action. See Horton v. Darby Elec. Co., Inc., 599 S.E.2d 456, 460–61 (S.C. 2004) (affirming summary judgment for the employer on the breach of contract claims by reviewing the employee manual and finding it to contain permissive language that did not provide for mandatory discipline).

Given that the court finds that there was no contract, there can be no breach of contract—a deviation from the handbook would speak to breach of contract rather than formation—and John Doe's additional arguments on whether the non-contract was allegedly breached are irrelevant. See King, 26 F. Supp. 3d at 517. Consequently, the court finds that John Doe has not plausibly stated a claim for breach of contract and the court dismisses the claim for failure to state a claim.

### 4. Promissory and Equitable Estoppel

Porter-Gaud argues that John Doe's promissory estoppel claim must be dismissed because John Doe has not alleged an unambiguous promise by Porter-Gaud. ECF No. 70 at 8–9. It relies on this court's order denying motion to amend to allow Mary Doe to assert claims of promissory estoppel. Id. at 9 (citing ECF No. 60 at 26). Porter-Gaud emphasizes that the court found "[t]he stated goals in the Porter-Gaud handbook are aspirational only, and do not rise to the level of clearly-articulated, definite terms." Id. (citing ECF No. 60 at 26). It asks the court to extend that logic to John Doe's claims

based on the same conduct and, therefore, dismiss his promissory estoppel cause of action for failure to state a claim.  Id.

In response, John Doe argues that if the breach of contract claim survives this motion to dismiss, then the promissory estoppel claim should be subsumed within it. ECF No. 83 at 21–22.  However, if the court dismisses the breach of contract claim, then equitable considerations favor retaining this claim of promissory estoppel.  Id.  John Doe emphasizes that he has stated "in great and plausible detail" this claim.  Id.  However, he does not provide that analysis in the promissory estoppel section, but likely references the arguments he presented in his breach of contract claim.[17]  Id.

In reply, Porter-Gaud emphasizes that John Doe has failed to identify an unambiguous promise made by Porter-Gaud on which he relied such that the court should dismiss his claim of promissory estoppel.  ECF No. 89 at 8–9.  Porter-Gaud references this court's analysis of Mary Doe's request to amend the complaint to allege a claim of promissory estoppel.  Id. (citing ECF No. 60 at 26).  The court held that "the references to Porter-Gaud's stated goals in its Handbook for how it treats its students do not rise to the level of an unambiguous promise because those aspirations, considered alone, lack clearly articulated, definite terms."  Id. (quoting ECF No. 60 at 26).  That logic equally applies to John Doe's claim of promissory estoppel based on the same clauses in the Porter-Gaud Handbook, such that the court should dismiss the claim.  Id.

---

[17] John Doe indicates that he has stated the promises in great and plausible detail, and he further avers that Porter-Gaud breached those promises, which caused specific damages.  ECF No. 83 at 22.  John Doe does not specify the promises, breach, or damages in this section, but provides a footnote citing to the second amended complaint, a footnote, and an attached exhibit, without explaining those documents' significance.  Id. at 22 n.38 (first citing 2d Amend. Compl. ¶¶ 5, 6, 22, 29, 34–36, 59–66); then citing ECF No. 83-8 at 1; and then citing ECF No. 83 at 12 n.27).

In order to establish a promissory estoppel claim, a claimant must demonstrate: "(1) the presence of a promise unambiguous in its terms; (2) reasonable reliance upon the promise by the party to whom the promise is made; (3) the reliance is expected and foreseeable by the party who makes the promise; and (4) the party to whom the promise is made must sustain injury in reliance on the promise." Satcher v. Satcher, 570 S.E.2d 535, 538 (S.C. Ct. App. 2002). "The applicability of the doctrine depends on whether the refusal to apply it would be virtually to sanction the perpetration of a fraud or would result in other injustice." Cruz v. City of Columbia, 877 S.E.2d 479, 482 (S.C. Ct. App. 2022) (quoting Satcher, 570 S.E.2d at 538), reh'g denied (Sept. 22, 2022), cert. granted (May 24, 2023). "[P]romissory estoppel requires an injury in reliance on an unambiguous promise." Id. at 483.

To state an enforceable promissory estoppel claim, "the promise to be enforced must be unambiguous with clearly articulated, definite terms, while the sustained injury must result from an inconsistent disposition by the promisor." A&P Enters., LLC v. SP Grocery of Lynchburg, LLC, 812 S.E.2d 759, 763–64 (S.C. Ct. App. 2018). "Therefore, the presence of either an ambiguous promise or an injury not arising out of the inconsistent disposition precludes promissory estoppel's application, though perceived inequities may exist." Id. In other words, "where a promise is unclear or the alleged harms are unconnected to the inconsistent disposition, the doctrine does not risk imposing its own inequity against the party sought to be estopped." Id.

The references to Porter-Gaud's aspirations of its treatment of students does not rise to the level of an unambiguous promise, because those aspirations considered alone lack clearly articulated, definite terms. See id. The specific pages referenced in the

43

handbook—and the discretion afforded to Porter-Gaud in how it handles harassment and abuse—indicates that the allegedly "mandatory" promises are, in fact, ambiguous. <u>See</u> <u>A&P Enters., LLC</u>, 812 S.E.2d at 763–64. Finding that John Doe has not plausibly stated a claim for relief, the court grants the motion to dismiss as to John Doe's promissory estoppel cause of action.

### III.  CONCLUSION

For the foregoing reasons, the court **FINDS AS MOOT** Porter-Gaud's motion to amend. The court **DEFERS RULING ON** Porter-Gaud's motion for protective order and **ORDERS** that the parties confer on details regarding the appointment of a special master. The court **GRANTS IN PART** and **DENIES IN PART** Porter-Gaud's motion to dismiss. The court **GRANTS IN PART** and **DEFERS RULING ON IN PART** John Doe's motion to compel Porter-Gaud. The court **DENIES WITHOUT PREJUDICE IN PART** and **DEFERS RULING ON IN PART** John Doe's motion to exceed. Finally, the court **DENIES WITHOUT PREJUDICE** John Doe's motion to compel Snapchat.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 13, 2024**
**Charleston, South Carolina**

44