**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:22-cv-02093-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| PORTER-GAUD SCHOOL, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

For the following reasons, the court severs and remands plaintiff John Doe's

("John Doe") state-law claims to the Charleston County Court of Common Pleas and

notifies the parties that it may dismiss John Doe's pending federal claim <u>sua</u> <u>sponte</u>.

**I.   BACKGROUND**

The court begins by briefly providing background on John Doe's factual

allegations.  After that, the court will provide a more detailed retelling of the long and

confusing procedural history that led to the present juncture.

**A.  Factual Allegations**

Defendant Porter-Gaud School ("Porter-Gaud") is "an independent coeducational

college preparatory day school" in Charleston, South Carolina.  ECF No. 62, 2d Amend.

Compl. ¶ 2.  In general, this case arises out of Porter-Gaud's investigation into a student's

claims that she was raped by another student.

In December 2018, the then fifteen-year-old John Doe engaged in an allegedly

consensual sexual encounter with his classmate and neighbor, Catherine Roe ("Roe").  <u>Id.</u>

¶ 9.  The two engaged in multiple sexual encounters with each other on separate

occasions.  <u>Id.</u> ¶¶ 12–13.  Five months after the initial encounter, Roe told her parents

1

that the initial encounter was non-consensual rape, though the remainder of the sexual interactions were mutually consensual.  Id. ¶¶ 14.  John Doe denies the claims of coercion on any occasion.  Id. ¶ 15.  Initially, both sets of parents decided that the matter was settled and that the teens should just stay apart.  Id. ¶ 16.

Roe, however, was not satisfied by that arrangement and instead told the Porter-Gaud school administrators and counselors that John Doe had raped her.  Id.  Porter-Gaud called the police to investigate the allegations of rape.  Id. ¶ 17.  The police did not arrest John Doe because "there was no evidence of [John] Doe's wrongdoing" and "[e]ven if Ms. Roe had told the police her side of the story, . . . it still would have been a: 'he said/she said' case with corroborating witnesses supporting Mr. Doe, not Miss Roe's account of the evening."  Id.  The police ended their investigation with no action taken against John Doe.  Id. ¶ 18.  Roe was dissatisfied with this outcome and purportedly "harassed, slandered, slapped and pushed [John] Doe publicly at school (twice)" as a result.  Id. ¶ 22.  Porter-Gaud thereafter brought in T&M Protection Resources, LLC ("T&M"), "investigators from New York with the #MeTOO Movement."  Id. ¶¶ 20–21.  Eventually, the investigators dropped their inquiry, and Porter-Gaud notified John Doe that there was no policy violation on his part and that he was free to return as a student in good standing.  Id. ¶¶ 24–27.  John Doe asserts that school officials refused to notify the other witnesses and students that they found he had engaged in no wrongdoing.  Id. ¶ 27.

### B.  Initiation of this Lawsuit and Dismissal of Mary Doe

John Doe's mother, Mary Doe, filed a complaint on behalf of her son in the Charleston County Court of Common Pleas on May 29, 2022.  ECF No. 1-1, Compl.; Doe v. Porter Gaud Sch., No. 2022-CP-10-02441 (Charleston Cnty. Ct. C.P. May 29,

2022).  Though Mary Doe filed this complaint on John Doe's behalf, John Doe was, at the time she filed the complaint, an adult who had turned eighteen on July 31, 2021.  Compl. ¶ 2.  In this initial complaint, Mary Doe asserted four causes of action under state law.  Id. ¶¶ 22–29.  She also asserted one cause of action under federal law for violation of Fourteenth Amendment Due Process and Equal Protection Rights and Title IX.  Id. ¶¶ 34–35.  On July 1, 2022, Porter-Gaud removed the case to this court, arguing that this court has federal question jurisdiction based on Mary Doe's single federal-law claim pursuant to 28 U.S.C. §§ 1331, 1441, and 1446.  ECF No. 1.

On July 21, 2022, Mary Doe amended her complaint to add John Doe as a co-plaintiff alleging the same causes of action.  ECF No. 8, Amend. Compl.  On January 6, 2023, the court found that Mary Doe had failed to allege facts giving rise to any claim on her own behalf and dismissed her from this case.  ECF No. 28.

Despite this order, Mary Doe then attempted to re-insert herself back into this lawsuit on multiple occasions, prompting the court to engage in extensive evaluation of her various state-law claims on those occasions.  For instance, she filed a motion for the court to amend or correct its order on February 3, 2023, ECF No. 31, and argued in her reply in support of that motion that she should be permitted to amend her complaint to reassert her claims, ECF No. 35.  The court denied that motion on April 3, 2023, after re-evaluating and re-confirming Mary Doe's meritless state-law claims.  ECF No. 36.  John Doe then moved to amend his complaint on June 24, 2023, so that he could add Mary Doe back as a co-plaintiff to assert various state-law claims.  ECF No. 51.  The court denied this motion on October 17, 2023, upon finding that Mary Doe's proposed state-law allegations were meritless and that an amended complaint would, therefore, be futile.

ECF No. 60.  In that same order, the court did, however, permit John Doe to amend his

complaint to assert additional allegations on his own behalf.  Id. at 34.

### C.  John Doe's Second Amended Complaint

Accordingly, on November 6, 2023, John Doe filed his second amended

complaint, which is now his operative complaint.  ECF No. 62, 2d Amend. Compl.  In

this pleading, John Doe initially asserted the following causes of action: (1) slander and

libel/slander and libel per se; (2) negligence/gross negligence/recklessness/willfulness;

(3) intentional infliction of emotion distress/outrage; (4) violation of Fourth and

Fourteenth Amendment Due Process and Equal Protection Rights and Title IX; (5) breach

of contract; (6) failure to supervise/failure to protect; and (7) promissory and equitable

estoppel/specific performance.  Id. ¶¶ 37–65.  Thus, much like in previous pleadings,

John Doe's second amended complaint alleges several state-law causes of action and a

single, amalgamated federal cause of action.  Id.

On December 5, 2023, Porter-Gaud moved to dismiss several of John Doe's state

causes of action, but notably did not move to dismiss his sole federal claim.  ECF No. 70.

In an order dated August 31, 2024 (the "August Order"), the court granted Porter-Gaud's

motion in part and dismissed John Doe's claims for breach of contract, failure to

supervise/failure to protect, and promissory and equitable estoppel.  ECF No. 101 at 18–

44.  As such, his remaining causes of action are for: (1) slander libel/slander & libel per

se and by implication, (2) negligence/gross negligence, (3) intentional infliction of

emotional distress/outrage, and (4) his federal claim for violation of Fourth and

Fourteenth Amendment Due Process and Equal Protection Rights and Title IX.  See id.;

2d Amend. Compl. ¶¶ 37–46.

4

### D.  Porter-Gaud's First Motion for Protective Order (ECF No. 63)

On November 9, 2023, Porter-Gaud filed a sealed motion for protective order in response to John Doe's subpoena duces tecum that he served on T&M.  ECF No. 63.  In this motion, Porter-Gaud requested an order of protection relieving T&M from its production obligation because the sought documents were privileged under the work product doctrine and the attorney-client privilege.  Id. at 1.  In response, John Doe argued that the documents were not privileged and that the work product doctrine did not apply.  ECF No. 76 at 2–14.  At a June 17, 2024 hearing, the court notified the parties that, due to the volume of documents subject to review, it might be necessary for the court to appoint a special master to assist in determining the privilege issue.  ECF No. 100.  In response, Porter-Gaud offered to revise and organize its privilege log and to produce the disputed documents for in-camera review.  Id.  On June 24, 2024, Porter-Gaud sent the court various documents for in-camera review.  These documents consisted of an updated privilege log, the 202-page T&M report, and 925 pages of Porter-Gaud's counsel's communications.

### E.  John Doe's First Motion to Compel (ECF No. 74)

John Doe moved to compel on December 18, 2023.  ECF No. 74.  He asked the court to compel Porter-Gaud to fully respond to his requests to admit, to his interrogatories, and to his RFPs.  Id. at 1.  In general, this material overlapped substantially with the material at issue in Porter-Gaud's first motion for protective order.

### F.  The August Order and September Agreement

In the August Order, the court determined that a "[c]lose review" of Porter-Gaud's large document production was necessary to decide whether the documents were

protected by attorney client privilege or the work product doctrine.  ECF No. 101 at 7.

Given that this review would require a thorough examination and cross reference of over

1,000 pages of documents, the court found that a special master remained necessary to

review the documents submitted by Porter-Gaud.  Id. at 7–8.  The court also noted it

would ultimately split the cost of the special master between the parties proportionally

based on the percentage of the motion for protective order that each party wins.  Id. at 7

n.1.  Ultimately, the court gave the parties fourteen (14) days to submit a joint report

suggesting both a special master and language on a special master appointment order.[1]

ECF No. 101 at 7.

Evidently, upon learning of how the court planned to divide the cost for the

special master, a spirit of unity came over the parties, and their once-insurmountable

disagreements no longer seemed so daunting.  Accordingly, in September 2024, the

parties came to an agreement on how to resolve their discovery issues.  However, they

failed to inform the court what that agreement was or how it impacted their various

pending motions.  Instead, Porter-Gaud's counsel sent an email on September 13, 2024,

to inform the court of the agreement's existence and promised that the parties would

follow up in the future with additional details.  No such follow up came.

Thereafter, John Doe's counsel sent the court a letter on October 4, 2024,

requesting that the court rule on John Doe's pending motion to compel.  Confusingly,

---

[1] Relatedly, the court also denied in part and deferred ruling on in part John Doe's
first motion to compel.  ECF No. 101 at 8–14.  The court found that John Doe had not
exceeded his permitted number of interrogatories, and the court denied the motion to
exceed the number of interrogatories without prejudice.  Id. at 13.  However, because the
material John Doe sought to compel overlapped with the material at issue in Porter-
Gaud's first motion for protective order, the court deferred ruling on the first motion to
compel until after the special master had issued his report.  Id. at 14.

despite counsel previously informing the court that the parties had reached an agreement in September to resolve the pending discovery issues, the October letter provided no reference to that agreement. Instead, John Doe's counsel explained that she reached out to Porter-Gaud's counsel ten times regarding various discovery requests. She stated that Porter-Gaud's counsel had only sent partial responses and that she did not believe Porter-Gaud would send full responses without court intervention. John Doe's counsel therefore requested that the court "place [the parties] on [its] motions roster again" so that she can renew her arguments regarding some of her previously filed discovery motions.[2] In other words, despite the parties purportedly reaching an agreement on their discovery issues, this letter indicated that those issues remained very much unresolved.

Moreover, the letter was not clear on what discovery Porter-Gaud was allegedly withholding. John Doe's counsel attached several emails to her letter that she had sent Porter-Gaud's counsel and left it to the court to piece together the basis of the parties' renewed disagreement. These emails appeared to pertain to two discovery issues. First, the emails discussed discovery regarding the T&M documents. These were apparently the same documents that the court had ordered be referred to a special master for a privilege review in the August Order. Second, in an August 29, 2024 email to Porter-Gaud's counsel, John Doe's counsel mentioned discovery related to Porter-Gaud's receiving federal funds. John Doe's counsel explained in this email that, based on this discovery, she may voluntarily dismiss her federal claims and move for the court to remand this case back to state court.

---

[2] John Doe's counsel also noted that, in the August Order, the court ruled that she had not exceeded her discovery limitations, and that her motion to compel was still pending.

7

### G. The December Status Conference

After receiving this letter and the attachments, the court ordered a status conference to clarify which issues remained pending and whether the parties had actually reached an agreement resolving their discovery disputes.  See ECF No. 107.  During the ensuing December 2, 2024 status conference, the parties informed the court that they had reached an agreement averting the need for a special master but that the agreement had since fallen apart.  See id.  Thus, they informed the court that they, once again, needed the court to step in and resolve their discovery issues.  Id.

During that same status conference, the court specifically asked the parties about whether Porter-Gaud ever received federal funding, a fact which would be necessary for John Doe to establish in support of his Title IX claim.  Id.  The parties noted that Porter-Gaud received some "library funds" but they did not agree on whether those funds counted for the purposes of the claims in this case.  Id.  The court told the parties that this was the first time it was hearing from them on this federal funding issue and asked whether these serious questions about the viability of John Doe's federal claim impact the court's subject-matter jurisdiction over this case.  Id.

In response to these questions, the parties revealed that part of their September agreement required that John Doe not dismiss his federal claim so that this court retained subject-matter jurisdiction over the case.  Id.  Indeed, in the September agreement, which the parties later filed as an attachment to subsequent discovery motions, the parties agreed, in part, that:

> 3. John Doe: agrees to refrain from withdrawing, moving to dismiss or otherwise eliminating either of his federal causes of action; confirms he has affirmatively submitted to the jurisdiction of the United States District

> Court for the District of South Carolina; and agrees to work with Porter-Gaud in good faith to keep the case before The Honorable David Norton.
>
> 4. The Parties acknowledge that this Agreement does not bind Judge Norton who has the power to sua sponte remand the case at any time without a motion of either party.

ECF No. 114-2 at 2. Upon learning of this portion of the agreement during the December status conference, the court explained to the parties that, no matter what agreements they reached, they cannot stipulate to the court's subject-matter jurisdiction. See ECF No. 107.

The court then asked if any of the outstanding T&M materials were relevant to John Doe's federal cause of action, and both parties agreed that they were not. See id. Thus, the court instructed the parties to update and re-file their discovery motions. See id. Additionally, given the court's jurisdictional concerns and the fact that the parties agreed that the discovery issues were not relevant to John Doe's federal claim, the court ordered that, if Porter-Gaud planned to file a motion for summary judgment on John Doe's federal claim, it would need to do so immediately. See id. In a series of follow up emails, the court ordered that Porter-Gaud's deadline for moving for summary judgment on the federal claim was January 15, 2025, and that the parties would need to brief the motion after that according to the deadlines set by the court's local rules.[3] In that email,

---

[3] Specifically, in a follow up email after the status conference, the court "direct[ed] that Porter-Gaud shall file its motion for summary judgment by January 15, 2024, [sic] at 5:00 p.m., and the parties shall, thereafter, brief the motion according to the normal briefing schedule outlined in the court's local rules."

John Doe's counsel responded to the court's email on December 3, 2024. She stated that she still needed to depose Porter-Gaud's 30(b)(6) designee before briefing a response on John Doe's federal claim, but she thought she would be able to do so by the January deadline. She noted that she might also need to depose an expert on her equal protection claim, but she stated, "[t]he issue of whether the school receives federal funding is a straight forward legal matter which I believe both sides have looked into

9

the court specifically advised the parties that it intended to hear arguments on John Doe's federal claims in February or March 2025 and that it would wait until after discovery is completed before hearing arguments on John Doe's state claims.

### H. Pending Motions Filed After the Court's December Status Conference

#### 1. Porter-Gaud's Second Motion for Protective Order (ECF No. 112)

On January 14, 2025, Porter-Gaud filed a new motion for protective order. ECF No. 112. Much of this motion was simply a renewal of its first motion for a protective order, ECF No. 63. Porter-Gaud reiterated that documents pertaining to the T&M investigation are not discoverable because they are protected by attorney-client privilege and the work product doctrine. ECF No. 112 at 5–8. Porter-Gaud also stated that John Doe seeks discovery on an unrelated matter, which is "primarily motivated by a desire to annoy, embarrass, and harass Porter-Gaud." Id. at 3. In this motion, Porter-Gaud did not provide details on what this unrelated matter is, but it argued that it is irrelevant or that there is good cause to limit production related to it. Id. at 3–5.

---

already. I suspect that can be briefed fairly quickly." She was concerned, however, that "a lot more work" was needed before she could brief her state claims. Porter-Gaud responded the same day and stated that it would file its motion for summary judgment by January 15, 2025. It also promised to make its school-affiliated witnesses available to John Doe and stated that "if the Court believes that the circumstances warrant providing Plaintiff with additional time to file an Opposition to Porter-Gaud's Motion, Porter-Gaud consents to an extension of additional time for Plaintiff to respond that the Court considers appropriate."

The court explained to them that "Porter-Gaud must file its motion for summary judgment on or before January 15, 2025, and this motion may include all of the pending claims[ and that the court] intends to hear arguments from the parties in February or March on whether to grant summary judgment on the federal claims, and [the court] will wait until after discovery is complete before hearing arguments on the state claims." John Doe's counsel responded, "That sounds good. Thank you!"

In response, John Doe revealed that, after the parties reached their September agreement, John Doe discovered that T&M was originally hired "in preparation for fallout from a documentary . . . about child sexual abuse occurring at the hands of Eddie Fischer, a long-ago Porter Gaud teacher and coach."  ECF No. 127 at 3.  John Doe agreed that the Fischer matter is not relevant but seeks evidence on Porter-Gaud's reaction to the documentary.  Id.  He argued that "[w]ith the aid of T&M, the school made certain promises to parents, including Doe's parents, that it had undertaken steps to ensure that child abuse prevention measures had taken place and that warning signs would never again be ignored" and created a new policy regarding sexual abuse and prevention.  Id. at 3–4.  John Doe contended that Porter-Gaud went outside of this policy when it hired third-party investigators in this case.  Id.  He seeks discovery on Porter-Gaud's previous investigations into other matters to determine if its investigation into John Doe's allegations were different from how it had conducted such investigations in the past.  Id. at 4–5.  He then went on to argue that attorney client privilege and/or work product doctrine has been waived.  Id. at 13–29.

Porter-Gaud replied and argued that there has not been such a waiver.  ECF No. 134.

### 2.  John Doe's Second Motion to Compel (ECF No. 113)

John Doe filed another motion to compel on January 15, 2025.  ECF No. 113.  In essence, he reiterated the same arguments he raised in his first motion to compel, ECF No. 74.  ECF No. 113 at 1.  In response, Porter-Gaud reiterated the same arguments it raised in its motion for protective order—i.e., that the unrelated matters are irrelevant, that there is good cause to limit the discovery, and that documents related to its

relationship with T&M are protected by attorney-client privilege. ECF No. 128. In his one-page reply, John Doe argued that Porter-Gaud's privilege log indicates that the documents it seeks are not privileged. ECF No. 131 at 1. He also requested that, if the court appoints a special master to resolve this matter, that Porter-Gaud be required to bear that cost—despite the court's August Order. Id.

### 3. John Doe's Motion to Modify and Unseal Certain Documents (ECF No. 115)

On January 15, 2025, John Doe filed a motion to modify and unseal certain documents. ECF No. 115. In this motion, John Doe argued that witness statements taken by T&M investigators need to be unsealed. Id. at 1. He argued that these statements were originally sealed because the witnesses were minors when they gave their interviews to the investigators. Id. However, because the witnesses are now over the age of twenty-one, he argued that their statements should be unsealed, so that they can be shown their prior statements and their recollections can be refreshed. Id. He contended he "consulted with opposing counsel as required under [the confidentiality agreement in this case] to no avail." Id. Porter-Gaud has not responded to this motion, and the deadline to do so passed on January 29, 2025.

### 4. Porter-Gaud's Motion for Summary Judgment (ECF No. 118)

Porter-Gaud moved for summary judgment on January 23, 2025.[4] ECF No. 118. In this motion, Porter-Gaud moved for the court to grant summary judgment on every one

---

[4] Per one of the court's previous orders granting an extension, Porter-Gaud's deadline for filing a summary judgment motion was January 21, 2025. ECF No. 111. On January 21, 2025, Porter-Gaud filed a motion to file its motion for summary judgment and related attachments under seal, but it did not file the motion for summary judgment itself, and it did not seek an extension of the deadline. ECF No. 116. The court granted the motion to file under seal via a text order on January 22, 2025. ECF No. 117. Porter-Gaud filed its motion for summary judgment on January 23, 2025. ECF No. 118.

of John Doe's causes of action. Id. As for John Doe's federal cause of action in particular, Porter-Gaud noted that John Doe's entire federal claim is, in essence, based on only one substantive allegation. Id. at 25 (citing 2d Amend. Compl. ¶ 46).

Porter-Gaud then argued that John Doe's federal claim fails because "Porter-Gaud does not receive federal financial assistance necessitating compliance with Title IX." Id. Notably, however, Porter-Gaud conceded that it participates in the E-Rate Program, which permits both private and public schools and libraries the opportunity to receive discounts on telecommunication services, such as the internet. Id. at 26. Yet, despite the court asking about this specific issue during the December status conference, Porter-Gaud did not fully brief the issue.[5] Instead, Porter-Gaud cited two cases, without explaining their significance. ECF No. 118 at 27. It then quoted a website called provisionscout.com, which claims that participation in the E-Rate Program does not trigger Title IX compliance, but Porter-Gaud did not explain what Provision Scout is or how it relates to this case. Id. at 27 & n.9. Porter-Gaud then stated:

> Because of the complexity of the issue and its possible effect on third-parties, Porter-Gaud requests additional time (and pages) to brief the issue should the Court fail to find in its favor on the merits of a Title IX claim (discussed below). Should it become necessary, the additional time could also allow the Court the benefit of amicus briefs from more experienced practitioners (upon information and belief, the National Association of Independent Schools may desire to file an amicus brief). Of course, if the Court desires briefing on this issue immediately, Porter-Gaud will quickly comply.

Id. at 27. Porter-Gaud then went on to argue that John Doe's federal claim fails on the merits and is barred by the ministerial exception. Id. at 27–33.

---

[5] The court believes this program is what the parties were referring to as "library funds" in the December status conference. See ECF No. 107.

To date, John Doe has not filed a response to Porter-Gaud's motion for summary judgment, and the deadline for doing so has long since passed.[6]  Instead, John Doe's counsel sent a letter to the court on February 13, 2025, in which she requested that the court "schedule motions in this case."  The letter went on to note that there are both pending discovery matters and a pending dispositive motion, and John Doe's counsel "worr[ied] that the plaintiff's reply will be delayed due to the [pending] discovery disputes."  She concluded by stating, "Please know that we have been working hard and are mindful of the age of the case.  However, we are stuck without guidance."

### I. March Status Conference

Once again, the court was confused by John Doe's counsel's February letter.  To reiterate, both parties had already conceded that that the pending discovery issues were not related to the federal cause of action, and the court had instructed the parties, both during the December status conference and in subsequent emails, to brief the federal issues <u>before</u> the court would resolve the discovery disputes.  Yet, in the February 13, 2025 letter, John Doe's counsel appeared to be holding that briefing hostage pending a ruling from the court on the unrelated discovery issues.

Thus, on March 14, 2025, the court held a second status conference to clarify.  ECF Nos. 136; 137, Tr. (transcript from the March status conference).  During the March status conference, the court asked the parties, again, whether the outstanding discovery issues were relevant to John Doe's state or federal causes of action.  Tr. 7:4–6.  While

---

[6] Under the local rules, responses to motions are due "within fourteen (14) days of the service of the motion unless the court imposes a different deadline.  If no memorandum in opposition is filed within fourteen (14) days of the date of service, the court will decide the matter on the record and such oral argument as the movant may be permitted to offer, if any."  Local Civ. Rule 7.06 (D.S.C.).

Porter-Gaud maintained that the disputed material was not relevant to any of the causes of action, John Doe asserted, this time, that the material was relevant to both his state and federal claims.  Tr. 7:7–10, 18:6–15.[7]  John Doe explained that he believed ECF Nos. 63 and 74 were still at issue, and the court noted that the parties' discovery disputes seem to keep getting resolved and then resurrected whenever the parties reach another disagreement.  Tr. 8:20–21, 9:3–5.

During this status conference, the court also asked the parties about the possible jurisdictional issues in this case stemming from John Doe's questionable federal claim, and the court expressed concern that, in their September agreement, the parties were "using [the court's] jurisdiction as a bargaining chip."  Tr. 16:11–12.  Additionally, because the state law causes of action seemed to predominate over the federal causes of action, the court noticed the possibility of remanding John Doe's state causes of action and keeping his federal cause of action and requested the parties' input on this option.  Tr. 10:1–10.  The parties then expressed that they would prefer to keep this case in federal court.  Tr. 16:11–22.  John Doe explained that he believes, based on recent Supreme Court precedent, that Porter-Gaud did accept federal money, which is relevant to his Title IX claim.  Tr. 21:21–22:12.  Porter-Gaud suggested that a decision from this court on the merits of John Doe's claims would be helpful given how long this case has been pending before this court.  Tr. 22:13–21.  Porter-Gaud also suggested that the best

---

[7] Later, when asked specifically whether he could respond to Porter-Gaud's summary judgment motion before the court ruled on the pending discovery disputes, John Doe stated he would need a ruling on the discovery issues before responding.  Tr. 18:6–15.  However, his response to this question did not specially mention his federal cause of action, and the court wonders whether he meant he would need a ruling on the discovery issues before responding to Porter-Gaud's motion for summary judgment in its entirety, which included his state causes of action.  See id.

way to move this case along would be for John Doe to fully brief a response to Porter-Gaud's pending motion for summary judgment. Id.

After the March status conference, the court sent an email instructing the parties to confer with one another and provide a list of which motions require rulings and explain which discovery issues were relevant to John Doe's state causes of action and which were relevant to his federal cause of action. In response, Porter-Gaud's counsel sent an email to the court on April 9, 2025, explaining that the parties still required a ruling from the court on whether Porter-Gaud would have to produce interviews and reports related to T&M investigations into two of Porter-Gaud's previous employees. Porter-Gaud's counsel further explained that it was waiting to receive documents related to these investigations that it would produce for the court's in-camera review and offered to confer with John Doe on the appointment of a special master to review these documents if necessary. In this email, Porter-Gaud's counsel indicated that the only two pending discovery motions are Porter-Gaud's most recent motion for protective order, ECF No. 112, and John Doe's most recent motion to compel, ECF No. 113. Porter-Gaud's counsel also explained that the outstanding discovery material related exclusively to John Doe's slander cause of action. That same day, John Doe's counsel responded in agreement with Porter-Gaud's counsel on which items remain in dispute and specifically acknowledged that "[t]he items that will remain in dispute and which will still need a ruling should not relate to the federal claims." On May 7, 2025, Porter-Gaud delivered another round of roughly 400 or more pages of documents for the court to review and cross-reference.

## II. DISCUSSION

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress

16

pursuant thereto." Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).

For this reason, "[s]ubject-matter jurisdiction cannot be conferred by the parties, nor can

a defect in subject-matter jurisdiction be waived by the parties.  Accordingly, questions

of subject-matter jurisdiction may be raised at any point during the proceedings and may

(or, more precisely, must) be raised sua sponte by the court."  Brickwood Contractors,

Inc. v. Datanet Eng'g, Inc., 369 F.3d 385, 390 (4th Cir. 2004) (citation omitted).

 This court has original jurisdiction, inter alia, over claims "arising under the

Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  When the court

has original jurisdiction over one claim in a lawsuit, it generally also has supplemental

jurisdiction over related claims that form part of the same case or controversy under

Article III.  28 U.S.C. § 1367(a).  However, in such cases, the court "may decline to

exercise supplemental jurisdiction" over pendent state-law claims if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Id. § 1367(c).

 Focusing on the second reason a court might decline exercising supplemental

jurisdiction, "if it appears that the state issues substantially predominate, whether in terms

of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy

sought, the state claims may be . . . left for resolution to state tribunals."  United Mine

Workers of Am. v. Gibbs, 383 U.S. 715, 726–27 (1966).  Beyond that, "the issue [of]

17

whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation." Id. "Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed." Id.

When a case presenting both state and federal claims is removed from state court to federal court and the federal court declines to exercise supplemental jurisdiction, the proper course is often to sever the state claims, remand those claims, and retain jurisdiction over the federal claims. See Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001) ("[W]e join the other courts of appeals which unanimously have treated the remand power as inherent in the statutory authorization to decline supplemental jurisdiction under § 1367(c)."); 13D Charles Alan Wright, Arthur R. Miller & Richard D. Freer, Federal Practice and Procedure § 3567.3 (3d ed.), Westlaw (database updated May 21, 2025); see also Arrington v. City of Raleigh, 369 F. App'x 420 (4th Cir. 2010) (holding that the district court should have sua sponte declined to exercise supplemental jurisdiction over novel and complex state law issues pursuant to 28 U.S.C. § 1367(c)(1), (2), and (3) and remanded those claims to state court when the sole federal claim was dismissed and the parties were exclusively arguing about state law issues from the start of the case). Thus, "[t]he exercise of discretion in these circumstances involves two overlapping decisions to be made by the district court—whether to continue exercising federal jurisdiction over pendent claims and whether to remand the case to State court." Hinson, 239 F.3d at 617. In deciding whether to remand, the court must consider "'principles of economy, convenience, fairness, and comity' and whether the

efforts of a party in seeking remand amount to a 'manipulative tactic.'" <u>Id.</u> (quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 357 (1988)).

If there were ever a case in which the state issues substantially predominated over the federal, it would be this one. As the lengthy procedural history laid out above clearly indicates, the parties have spent the last three years arguing almost exclusively about the merits of the Does' state-law claims and discovery issues incidental to those claims. Indeed, with the exception of Porter-Gaud's recent motion for summary judgment, the parties' briefing has scarcely even acknowledged the existence of a federal claim at all. To illustrate this point, the court will start by highlighting a few examples of the significant time and effort spent adjudicating the state-law issues and will compare that with an examination of John Doe's sole federal cause of action.

First, there were the state-law issues related to the claims asserted by Mary Doe, which the court considered, re-considered, and re-re-considered as a result of the parties' motion practice. <u>See</u> ECF Nos. 28; 36; 60.

Second, after dismissing the claims asserted by Mary Doe, the court considered the viability of several of John Doe's state-law claims in the August Order. ECF No. 101. In doing so, the parties forced the court to analyze many of the same issues again, as it dismissed some of John Doe's claims for the very same reasons it dismissed the same or similar claims asserted by Mary Doe. For example, in the August Order, the court dismissed John Doe's breach of contract claim because he had not plausibly alleged the existence of a contract between himself and Porter-Gaud. <u>Id.</u> at 30–41. As the court discussed at length, John Doe was essentially reasserting many of the same arguments that the court had previously rejected in prior orders when assessing Mary Doe's

negligence claim, which had been premised on a breach of contractual duty, and Mary's Doe's proposed breach of contract claim. Id. at 31–33; see also id. at 31 ("The court notes that many of the arguments John Doe raises in support of this claim were already ruled on—and rejected—by the court. Indeed, many of his arguments seem more suited for a motion to reconsider, rather than in support of the plausibility of his pleadings.").

Third, the parties have bogged the court down with endless discovery disputes involving hundreds of pages of documents, and as the parties now seem to agree, these outstanding issues are not related to John Doe's federal claim. Yet, combing through these documents and resolving these disputes will require considerable effort and attention. Beyond that, the difficulty of this task has only been amplified by the parties' attempts to circumvent the court's orders and by their inconsistent explanations about which issues remain pending. If the parties had simply agreed on a special master—as the court ordered nearly a year ago—many, if not all, of the pending discovery issues would likely now be resolved. Instead, the parties dodged the court's August Order by informing the court they had reached an agreement averting the need for a special master, failing to provide an explanation to the court on what their agreement was, allowing that agreement to fall apart and thus failing to actually resolve the disputed issues, demanding that the court intervene in resolving the issues without a special master, providing inconsistent explanations to the court on what discovery issues remain pending, and ignoring the court's briefing deadlines.[8]

_____

[8] Despite the court giving the parties a deadline to brief summary judgment (and later extending that deadline), Porter-Gaud still failed to move for summary judgment on time, and when it did so move, it stated that there may be additional issues that it would only brief if the court further requested. See ECF No. 118 at 27. These issues were the

Now compare these efforts at litigating the state issues with the parties' treatment of John Doe's sole federal claim. The parties have scarcely mentioned this claim over the past three years, and the court thus turns all the way back to John Doe's operative pleading. Unfortunately, after reviewing his second amended complaint, the court is not even certain what his federal claim is.

The caption for John Doe's Fourth Cause of Action states he is alleging a "Violation of 4th and 14th [sic] Amendment Due Process and Equal Protection/Civil Rights and Title IX". Id. at 17. Yet, just below this caption, the single-sentence allegation supporting this cause of action states:

> 46. The actions and inactions of the defendant as stated above discriminated against plaintiff on account of his sex and violated his right to, e.g. Equal Protection under the law and to substantive and procedural Due Process in violation of the fourth and 14th amendments to the United States Constitution pursuant to 42 U.S.C. § 1981 et. seq. and also violated his constitutional rights under 15 U.S.C. § 38 et. seq, Title IX.

2d Amend. Compl. ¶ 46.

There are a number of clear defects with this allegation. First, despite the caption, John Doe's substantive allegation makes only a passing reference to the Fourth Amendment and provides no basis to support a claim that Porter-Gaud violated John Doe's rights to be free of "unreasonable searches and seizures." U.S. Const. amend IV. The court is not going to invent a claim on his behalf.

---

specific issues the court asked Porter-Gaud to brief during the December status conference. See ECF No. 107. Then, rather than requesting an extension of his deadline to file a response, John Doe simply informed the court that he would not be filing his response until the court gives him an answer on his discovery motions, which again would have been resolved if the parties had agreed on a special master as the court ordered them to in August.

Second, despite providing lip-service to Title IX in the caption and using the words "Title IX" in the allegation, John Doe does not actually allege a violation of Title IX. See 2d Amend. Compl. ¶ 46. In general, "Title IX prohibits federally-supported educational institutions from practicing discrimination on the basis of sex." Sheppard v. Visitors of Va. State Univ., 993 F.3d 230, 234 (4th Cir. 2021). With sufficient facts, a plaintiff can be successful in pursuing a Title IX claim under a number of different theories. See id. at 236. However, in this case, not only does John Doe fail to indicate any theory he believes supports his claim but he also fails to allege the basic facts necessary to support such a claim under any theory. See 2d Amend. Compl. Notably, while the subject of Porter-Gaud's alleged federal funding has come up in status conferences, John Doe makes no allegation whatsoever in his second amended complaint that Porter-Gaud ever received federal funding. See generally id. This omission is fatal to his Title IX claim. See 20 U.S.C. § 1681(a) (prohibiting discrimination "on the basis of sex" while engaging in "any education program or activity receiving Federal financial assistance" (emphasis added)).

Third, John Doe appears to allege that Porter-Gaud violated his rights under the Fourteenth Amendment's Due Process and Equal Protection clauses.[9] 2d Amend. Compl.

---

[9] John Doe states that he brings his Fourteenth Amendment claims "pursuant to 42 U.S.C. § 1981 et. seq." 2d Amend. Compl. ¶ 46. Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981. Section 1983, in contrast, imposes liability on officials who deprive citizens of rights secured to them under the Constitution and laws of the United States when the official acts "under color of" state law. See 42 U.S.C. § 1983. Because John Doe makes no claim that he was deprived of the rights enjoyed by white citizens, the court assumes he meant § 1983. If he did mean § 1981, this is another reason his federal claim is woefully

¶ 46.  He suggests that Porter-Gaud did so by barring him from campus several months after the rape allegations and not simultaneously barring Roe from campus.  Id. ¶ 6. However, John Doe makes no suggestion that Porter-Gaud's actions are attributable to the state, which dooms his Fourteenth Amendment claims.  See Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982) ("The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?' . . . If the action of the respondent school is not state action, our inquiry ends." (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).  Of course, there are instances when there "is a 'sufficiently close nexus' between [a private actor's] challenged action and the state so that the challenged action 'may be fairly treated as that of the State itself.'"  Peltier v. Charter Day Sch., Inc., 37 F.4th 104, 115 (4th Cir. 2022) (quoting Mentavlos v. Anderson, 249 F.3d 301, 310 (4th Cir. 2001)).  However, if that is true in this case, John Doe has made no such allegation.  See 2d Amend. Compl.

Finally, the court simply does not understand John Doe's assertion that Porter-Gaud "also violated his constitutional rights under 15 U.S.C. § 38 et seq."  2d Amend. Compl. ¶ 46.  Section thirty-eight of title fifteen does not provide John Doe with constitutional rights—it exempts associations of marine insurance companies from certain federal antitrust laws.  See 15 U.S.C. § 38.  Unless John Doe's former high school is preventing him from monopolizing the boat insurance market, the claim he asserts under this section does not hold water.

---

defective.  See Rutledge v. Sumter Cnty. Sch. Dist., 2020 WL 5742801, at *4 (D.S.C. Sept. 25, 2020) ("Plaintiff cannot bring cognizable sex discrimination claims under § 1981 based upon the plain language of the statute.").

Considering the obvious defects in John Doe's federal allegation and the parties' failure to mention this allegation over the last three years, and comparing that to the extensive time and effort put forth in litigating John Doe's state claims, the court finds that the parties clearly considered his state claims more important than his federal. <u>See</u> <u>Gibbs</u>, 383 U.S. at 727 ("For example, it may appear that the plaintiff was well aware of the nature of his proofs and the relative importance of his claims; recognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case."). The court suspects the reason for this is because the parties recognize that his state claims are truly the substance of this case, and yet they insist on "allowing a federal tail to wag what is in substance a state dog." <u>Borough of W. Mifflin v. Lancaster</u>, 45 F.3d 780, 789 (3d Cir. 1995). Further, the court also finds that there is a difference in the proof and scope of the claims based on the sizable number of the T&M investigation documents that are related to the state claims as opposed to the federal funding issues that are related to the federal claim. For these reasons, the court finds that John Doe's state claims "constitute[] the real body of [this] case, to which [his] federal claim is only an appendage." <u>Gibbs</u>, 383 U.S. at 727. In other words, the court finds that John Doe's state claims substantially predominate over his federal claim. <u>See</u> 28 U.S.C. § 1367(c).

Having found the statutory criteria for declining supplemental jurisdiction met, the court now must decide if remand is appropriate by considering "'principles of economy, convenience, fairness, and comity' and whether the efforts of a party in seeking remand amount to a 'manipulative tactic.'" <u>Hinson</u>, 239 F.3d at 617 (quoting <u>Carnegie-Mellon Univ.</u>, 484 U.S. at 357). The court finds that these considerations favor remand.

First, it would neither be fair nor respectful of state court jurisdiction to keep this case in this court. For the last three years, the parties have litigated their state claims in this court based on nothing more than a single-sentence, highly questionable federal allegation. What is more, the parties reached an agreement with one another to keep this case in federal court by mutually promising to not dismiss that single-sentence cause of action, despite its obvious defects. See ECF No. 114-2 at 2. This court's Article III jurisdiction is neither a bargaining chip to be worked around nor is it a technical formality. It is a constitutional limitation on this court's power and a respect for the legitimate authority of the state courts, and it would not be fair to allow the parties to manipulate that limit in this manner.

Second, the interest of judicial economy is clearly not served by forcing the court into a years-long game of whack-a-mole while it attempts to chase down disappearing and reappearing discovery issues. While these discovery issues may still be present in state court after remand, the relevance of the disputed material, or lack thereof, will be easier to ascertain after the federal claim is severed. Additionally, given the questionable jurisdictional basis of keeping this case in federal court, monopolizing the court's time in this manner on discovery related to state-law issues is not fair to other litigants waiting for their cases to be heard in this court. Thus, the court finds it appropriate to sever John Doe's state claims and remand those claims to the Charleston County Court of Common Pleas.

Finally, given the defects in John Doe's remaining federal cause of action outlined above, the court has serious doubts about the viability of that claim. Indeed, the court is considering whether it should dismiss John Doe's federal cause of action sua

*sponte* for failure to state a claim.  See, e.g., Robertson v. Anderson Mill Elementary Sch., 989 F.3d 282, 290–91 (4th Cir. 2021).  The parties shall respond within fourteen days of the issuance of this order with briefing on whether dismissal is appropriate.  After that, the court will issue an order with its decision on whether it will dismiss.[10]

### III.   CONCLUSION

For the reasons set forth above, the court **SEVERS** and **REMANDS** John Doe's first, second, and third causes of action to the Charleston County Court of Common Pleas.  The court further **ORDERS** the parties to file briefing within fourteen (14) days of the issuance of this order with their positions on whether the court should dismiss John Doe's fourth cause of action.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**July 28, 2025**
**Charleston, South Carolina**

---

[10] Alternatively, because John Doe's deadline for responding to Porter-Gaud's motion for summary judgment has long since passed, the court may simply consider whether to grant that motion without John Doe's input.  See Local Civ. Rule 7.06 (D.S.C.) ("If no memorandum in opposition is filed within fourteen (14) days of the date of service, the court will decide the matter on the record and such oral argument as the movant may be permitted to offer, if any.").